Evelyn WRIGHT and Robert
Wright, Plaintiffs,

v.

AMERICAN HOME PRODUCTS
CORP., et al., Defendants.

Civil Action No. 99C–361–JOH.

Superior Court of Delaware,
New Castle County.

Submitted: Nov. 22, 1999.
Decided: April 20, 2000.

L. Vincent Ramunno, Esq., of Ramunno & Ramunno, P.A., Wilmington, Delaware, for plaintiffs.

Mark Minuti, Esq., of Saul, Ewing, Remick & Saul, LLP, Wilmington, Delaware, for defendants Les Laboratoires Servier and Servier Amerique.

## OPINION

HERLIHY, Judge.

Plaintiffs Evelyn and Robert Wright have sued Evelyn Wright's doctor, Dr. David Messenger, several American pharmaceutical companies and two French pharmaceutical companies as a result of taking a prescription diet pill, Pondimin. The two French companies, Les Laboratoires Servier [LLS] and Servier Amerique [SA] [collectively French defendants] have moved to dismiss for ineffective service of process, lack of personal jurisdiction and *forum non conveniens.*

Plaintiffs brought LLS and SA into this lawsuit by employing the procedures of Delaware's long arm statute. They first had their complaint served on the Delaware Secretary of State and then mailed copies of it by registered mail to these French companies in Paris. LLS and SA contend that, as foreign companies, this method of service was not in compliance with the Hague Convention. Even if prop-

erly served, they next argue Delaware cannot exercise personal jurisdiction over them either because the long arm statute does not provide it or Due Process prevents it. Finally, in the event all these barriers are overcome, they argue Delaware is not the convenient forum for plaintiffs' cause of action against them. Several of the issues raised by the French defendants' motion are of first impression or extension of Delaware precedent into fresh waters.

One of the biggest problems for the Court in resolving the French defendants' motion is sorting out their relationship with each other, with other entities and with Pondimin, the diet pill Mrs. Wright consumed. The main ingredient or other name for Pondimin is fenfluramine. There is a chemically-related diet drug, dexfenfluramine, which is sold as Redux, with which the French defendants have some involvement. But, Mrs. Wright never took Redux.

The French defendants have submitted affidavits from two French counsel. The affidavits solve as many problems as they raise. These counsel have supplied similar affidavits in diet pill litigation elsewhere. Included in that litigation is the Multi District Litigation in the District Court for the Eastern District of Pennsylvania [MDL] concerning these diet medications.[1] This Court is indebted to an opinion of the MDL court for its efforts in sorting out this tangled web. There also has been litigation concerning one or both drugs in New Jersey and New York. LLS was the only entity, however, sued in those cases. SA was not a party in any of them in terms of opinions provided to this Court.

LLS filed similar motions to dismiss in those cases, as it has filed here. Each of the courts considering them struggled, too, to sort out the jurisdictional facts and relationships of these French defendants, to

---

1. *In Re: Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Products Liability Litigation,* D.C.E.D. Pa., C.A.No. 98–20299, Bechtle, J. (November 16, 1998) Lexis No. 18109.

other French companies related to them and to the American pharmaceutical companies. Despite access to the records in some or all of those cases and other litigation, the plaintiffs here have not presented the clearest of pictures. For instance, they lump together LLS and SA and refer to them as "Defendants Servier."[2] Whether by design or inadvertence, this casual linking is not particularly helpful to this Court's analysis. The Court strongly suspects there is more information which would be helpful in resolving some of the issues presented, but it is not in the record yet.

With these remarks and caveats stated, an analysis of the record presented is needed. Mrs. Wright alleges she ingested, on Dr. Messinger's prescription orders, Pondimin from March 1995 to May 1996. She makes a number of claims of negligence relating to Pondimin, including failing to use due care in designing, testing and manufacturing, failing to properly warn, failing to provide adequate training and information about it to medical providers and more. There are claims for breach of implied warranty, breach of express warranty, strict liability and fraud. Mrs. Wright claims serious physical injury, pain and suffering and loss of income among her other claims.

The French defendants have submitted affidavits of Marc C. Milward, corporate counsel for LLS. He states that in 1963, a company known as Science–Union et Cie [SUC] licensed defendant A.H. Robins Company to manufacture and sell Pondimin in the U.S.[3] He states that each company has its own board and officers.[4] But, he says, SUC is an "affiliated company" of LLS and SA.[5] The nature of the affiliation is not explained. Nor is it explained further in the other court opinions in which LLS has sought to be dismissed.

The licensing agreement with A.H. Robins, Milward says, provided for royalties to be paid to SUC, which ended in 1988.[6] While Pondimin continued to be sold thereafter, SUC was not involved in the marketing or selling of the drug.[7] Neither LLS nor SA, he says, received money in connection with the licensing of Pondimin.[8]

Milward further explains that LLS had a licensing agreement with another U.S. company for Redux.[9] That agreement was with Interneuron and was signed in 1990.[10] In that agreement, LLS granted Interneuron the exclusive rights to use, manufacture and sell dexfenfluramine, Redux. The exclusive area was the U.S., Puerto Rico and U.S. territories. Interneuron was able to grant sublicenses involving Redux but only with LLS's prior written approval. The agreement also provided other LLS controls over Interneuron. LLS was also to be kept informed of FDA application and approval process. In short, the 1990 agreement kept LLS intimately involved in the process to protect LLS' patent and of obtaining FDA approval for Redux.

Milward states that as a result of corporate acquisitions by American Home Products [AHP], Wyeth–Ayerst [Wyeth] was marketing Redux and Pondimin in the period Mrs. Wright was taking Pondimin.[11] He goes on to state that SUC's license agreement with A.H. Robins differs from LLS' with Interneuron for Redux.[12] Milward claims that the two drugs are differ-

2. Plaintiffs' Answering Brief at 4.

3. Milward Affidavit (September 21, 1999) ¶ 7.

4. *Id.*

5. *Id.*

6. *Id.*

7. *Id.*

8. *Id.*

9. *Id.* at ¶ 8.

10. *Id.*

11. *Id.*

12. *Id.* at ¶ 10.

ent, have different patents by different parties and each was the object of a separate New Drug Application [NDA] to the FDA.[13] But according to an Executive Vice President for Clinical Research for Wyeth there are similarities of the main chemical components of Redux and Pondimin, dexfenfluramine and fenfluramine.[14]

In opposing the French defendants' motions, the plaintiffs have provided several documents which tend to show SA's involvement with fenfluramine and dexfenfluramine.

1. A July 15, 1996 letter from SA to Wyeth listing the countries around the world where the two drugs are registered and date of registration.

2. A March 2, 1990 Wyeth internal memorandum discussing a meeting between Wyeth personnel and Madame Derome–Tremblay held in the United States in the Philadelphia area. The memorandum says she is President of SA. The discussion was about Pondimin. She wanted to make sure Wyeth would be making reports to SA about Pondimin. The memorandum states that she said Pondimin was a Schedule IV drug in the U.S. but unscheduled elsewhere.

3. A September 21, 1994 memorandum memorializing a meeting between M. Derome–Tremblay, Wyeth and other people about dexfenfluramine.

4. A June 7, 1995 SA letter to Wyeth enclosing a fenfluramine report concerning adverse drug reactions.

5. A June 16, 1995 Wyeth letter to SA indicating it is time to submit an annual report on fenfluramine to the FDA. The letter requested certain information from SA stating, in part, "[p]art of this review involved calculations to determine if an increased frequency of serious, expected adverse events has occurred during the reporting period."

6. A February 1996 letter from SA to Wyeth reviewing topics discussed in a telephone conversation the day before. Included were Redux and fenfluramine supply. The letter also discussed an upcoming meeting about these and the other topics outlined in it.

7. A March 18, 1996 letter from SA to Wyeth enclosing a copy of a report on the Committee for Proprietary Medical Products. The Committee is apparently an agency or arm of the European Agency for the Evaluation of Medicinal Products which appears to be an agency of the European Economic Council. The report concerned a possible causal linkage between fenfluramine and primary pulmonary hypertension. SA's letter to Wyeth indicated it was appealing the opinion that there was a causal relationship.

There are other documents relating to the relationship between SUC and LLS. One is a 1973 letter from a doctor who states he had been working a long time for SUC in which he states, SUC "[i]s a research subsidiary of Servier ...."[15] The letter concerns fenfluramine and alludes to patent questions raised by Smith, Klein and French [SKF]. In 1973, SKF sued LLS and SUC over an alleged patent infringement.

Plaintiffs have provided some pleadings from that litigation. One such pleading is a SUC answer to a SKF interrogatory about LLS's involvement in SUC's patent license negotiations involving fenfluramine. Among the answers provided, SUC states, "[LLS] has on some occasions used its good offices and contacts on behalf of [SUC] and in the negotiation of licenses on its behalf."[16] LLS said it received no

---

13. *Id.* at ¶ 11.

14. Joseph Pittelli Deposition (August 6, 1998) at 93.

15. Pinard letter (January 2, 1973), Plaintiffs Exhibit U.

16. Plaintiffs' Exhibit PP, SUC's answers to SKF's second set of interrogatories, Interrogatory No. 16.

payments for this "friendly assistance."[17]

In considering LLS's motion to dismiss, the MDL court noted other information. One, as noted above in paragraph No. 2, was that LLS people came to the Philadelphia area offices of Wyeth for their meetings. Another, as the records in this case show, was M. Derome–Tremblay who was a LLS and a SA officer. The MDL court also mentioned that LLS officials made trips to the FDA in Rockville, Maryland, concerning Pondimin.

## DISCUSSION

### I

### *Service of Process*

The French defendants' first attack on the jurisdiction of this Court is that they were not properly served in accordance with the Hague Convention or the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters [Hague Service Convention].[18] France and the United States are signatories of the Hague Service Convention.

In bringing the French defendants into this litigation, the plaintiffs utilized the procedure provided in Delaware's long arm statute.[19] They had their complaint served, as the statute sets out, first upon the Delaware Secretary of State. After that service was returned, they sent, by registered mail, copies of the complaint to each French defendant at their headquarters in Paris, France. · The copies of the complaint which they sent were in English. There were no French translations of the complaints.

The procedures of service of process under the Hague Service Convention have been previously outlined by this Court in

*Quinn v. Keinicke.*[20] Article 2 of the Hague Service Convention requires each member nation to establish a central authority to receive requests for service of documents from other countries.[21] In addition to this, however, Article 6 states that a member nation may consent to other means of service of process within its borders.[22]

It is that provision and Article 10, particularly, which are at the core of the dispute over the sufficiency of process in this case. Article 10 of the Hague Service Convention states:

> Provided the State of destination does not object, the present Convention shall not interfere with—
>
> (a) the freedom to send judicial documents, by postal channels, directly to persons abroad,
>
> (b) the freedom of judicial officers, officials, or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,
>
> (c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials, or other competent persons of the State of destination.[23]

*Quinn* represents this Court's most recent pronouncement on the interrelationship of the Hague Service Convention and the Delaware long arm statute. The defendant in *Quinn* was a resident of Denmark who was involved in an automobile accident while driving through Delaware. She was served under the provisions of the statute regulating service on non-resident

---

17. *Id.*

18. November 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638, 658 U.N.T.S. 163, reprinted in 28 U.S.C.A. Rule 4 at 210.

19. 10 *Del. C.* § 3104.

20. Del.Super., 700 A.2d 147 (1996).

21. *Id.* at 153, *citing* to Article 2 of the Hague Service Convention.

22. *Id.*

23. Hague Service Convention, Article 10.

motor vehicle owners or operators.[24] The plaintiff followed the procedures of § 3112 by first having the complaint served on the Delaware Secretary of State and within seven days of the return of that service, sending, by registered mail, a copy of the complaint to the Danish defendant in Denmark.

The defendant in *Quinn* argued that the plaintiff's method of service did not comply with the Hague Service Convention. She acknowledged the Secretary of State was served. But, she contended, she was mailed a copy of the complaint and this was not service as the Hague Service Convention required. Even though Article 10(a) uses the word "send," she argued that send means serve and mailing to her was not service.

The *Quinn* court held that the Hague Service Convention and § 3112 applied.[25] It held the plaintiff had complied with the procedural requirements of § 3112 by serving the Secretary of State and then sending by registered mail a copy of the complaint to the Danish defendant.[26] By doing so, that court held the plaintiff also complied with Article 10(a) of the Hague Service Convention.[27] In reaching this holding, the court stated it was unnecessary for it to determine whether Article 10(a) alone, using the word "send," permits service abroad by mailing.[28] As there had been service on the Secretary of State under § 3112, there was no need, the court said, to decide that issue.[29]

The French defendants in this case contend that *Quinn* is inapplicable and they renew the argument made by the Danish defendant in *Quinn* that there cannot be effective service under the Hague Service Convention when it is sent in the mail. In arguing *Quinn's* inapplicability, the

French defendants point to several factual and legal differences between the two cases. One is that the Danish defendant was actually present in the state. There was never such presence by either French defendant in Delaware. In addition, the tortious act complained of in *Quinn* was committed in Delaware when the defendant was physically present here. These two circumstances enabled the plaintiff in *Quinn* to invoke and use § 3104. Neither factor, however, is present here.

But, it is unclear to what extent, if any, these differences affect the service of process issues in this case. A non-resident of Delaware who drives or operates a motor vehicle in this state is deemed to have appointed the Secretary of State as such person's agent for service of process.[30] By the same token, a non-resident, be it a person or corporation or other entity, who or which commits any act or acts enumerated in the long arm statute implicated here, § 3104, is also deemed to have appointed the Secretary of State of Delaware as the agent for service of process.[31] Therefore, for the analysis of the issue of service of process, the differences cited by the French defendants do not matter. The initial question is whether they committed one or more acts which qualify as a jurisdictional precondition under § 3104(c) triggering the ability to serve the Secretary of State. Unlike § 3112 which requires presence in Delaware when the tortious act occurs, some of § 3104's jurisdiction preconditions do not require that presence.

The French defendants contend *Quinn* is also inapplicable to this case because they disagree with its holding. This contention is the more central to their argument why the service of process on them

24. 10 *Del. C.* § 3112.

25. *Quinn,* 700 A.2d at 154, 155.

26. *Id.* at 155.

27. *Id.* at 155, 156.

28. *Id.* at 155.

29. *Id.*

30. 19 *Del. C.* § 2112(a).

31. 10 *Del. C.* § 3104(b).

was ineffective under the Hauge Service Convention. Under it, they claim, service by mail on them is not service and, therefore, cannot be effective. As noted, the court in *Quinn* found it unnecessary to decide whether, under the Hague Service Convention alone, sending a complaint in the mail was effective service.

But, they argue here, in tying together the motor vehicle long arm statute to the Hague Service Convention, *Quinn* ignored the dictates of *Volkswagenwerk Aktiengesellschaft v. Schlunk.*[32] In their brief, they say that case held, "[t]he U.S. Supreme Court had held that the provisions of the [Hague Service] Convention preempt local procedural rules."[33] That is not what the Supreme Court said. Rather, the Supreme Court stated, "the [Hague Service] Convention pre-empts [sic] *inconsistent* methods of service prescribed by state law in all cases in which it applies."[34] In short, the French defendants misstated the language of *Volkswagenwerk.*

In addition to that misstatement, they argue that *Volkswagenwerk* mandates that the foreign defendant be served and that mailing a complaint does not satisfy that mandate. Their argument overlooks the Supreme Court's statement that, "Hence, neither the language of the [Hague Service] Convention nor the negotiating history contradicts our interpretation of the [Hague Service] Convention, according to which the internal law of the forum is presumed to determine whether there is occasion for service abroad."[35]

In *Volkswagenwerk,* the plaintiffs brought a state wrongful death action arising out of an automobile accident. Among those originally sued was an American entity which plaintiffs alleged defectively de-signed and assembled the car in question. The American entity was a wholly-owned subsidiary of a German corporation. When the American company denied designing or assembling the car, the plaintiffs sued the German company. They served the wholly-owned subsidiary. This service was made under state law. In summing up its holding that a German corporation had been properly served when its wholly owned American subsidiary was served, the Court said, "where service on a domestic agent is valid and complete under both state law and the Due Process Clause, our inquiry ends and the [Hague Service] Convention has no further implications."[36]

The Supreme Court's decision in *Volkswagenwerk,* therefore, does not help the French defendants, since there was service on the American entity and service by mail was not even an issue. That puts the analysis back at *Quinn.* But, as noted, *Quinn* did not decide if mailing the complaint to the foreign defendant satisfied the Hague Service Convention. The Court in *Quinn,* however, after grounding its decision that service was effectuated by serving the Delaware Secretary of State and then mailing it to the Danish defendant, went on to state it would be inclined to hold that service by mail would satisfy the Hague Service Convention.[37]

The Court in *Quinn* reached this result after an extensive analysis of the judicial debate over whether "send" in Article 10(a) permits service by mail. In following the line of authority reaching that same result,[38] the Court acknowledged an earlier decision of this Court in *King v. Miyata Bicycle of America, Inc.*[39] In *King* this Court held that mailing a copy of a com-

**32.** 486 U.S. 694, 108 S.Ct. 2104, 100 L.Ed.2d 722 (1988).

**33.** Defendants' Opening Brief at 8.

**34.** *Volkswagenwerk,* 486 U.S. at 699, 108 S.Ct. at 2108 [emphasis added].

**35.** *Id.* at 704, 108 S.Ct. at 2110.

**36.** *Id.* at 707, 108 S.Ct. at 2112.

**37.** *Quinn,* 700 A.2d at 156.

**38.** *Id.* at 157 n. 15.

**39.** Del.Super., C.A.No. 91C–08–123, Taylor, J. (May 15, 1992).

plaint to a Japanese corporation was not service under Article 10(a) of the Hague Service Convention.

In their discussions of "send" and "service" the courts in *King* and *Quinn* cited many cases which have come down on the opposite sides of this issue.[40] It is unnecessary to list anew all of those citations. This Court has reviewed the analysis of many of the courts on each side of this divide. Their reasoning need not be restated here. Confronting the Court now is the contradictory opinions of *King* and *Quinn*, even though the latter is *dicta*.

■ This Court adopts the holding in *Quinn* and the reasoning for that holding. The plaintiffs here followed the procedural dictates of § 3104. As in *Quinn*, by serving the Secretary of State and then sending, by registered mail, to each French defendant a copy of the complaint, they complied with the long arm statute and the Hague Service Convention. There is, of course, the one factual/legal difference between *Quinn* and this case, namely, the foreign defendant's presence there, but not here, and the role that may play between these cases.

This Court, under these circumstances, will further hold that plaintiffs' sending, by registered mail to each defendant, constitutes service under Article 10(a) of the Hague Service Convention. In reaching this holding, the Court accepts the *dicta* of the *Quinn* court. It found more persuasive the line of cases that service was effectuated by mail.[41] One of the factors which persuaded the *Quinn* court to go in this direction is that Denmark had not

objected, as was its right under the Hague Service Convention, to service by mail.[42] This reasoning, of course, was not the only basis for the *Quinn* court's *dicta*. This Court is persuaded, too, that lack of objection is an element in deciding service may be had by mail. France has not objected to service by mail.[43] And this Court is persuaded that the reasoning of *Quinn* in reaching its *dicta* is persuasive, acknowledging that this Court is not following another decision of this Court, namely, *King*. Finally, of course, in both *Quinn* and here, there was service on the Delaware Secretary of State.

■ In conclusion, this Court adopts the view that service on the French defendants was effectuated by mailing them copies of the complaint. This method was consistent with Article 10(a) of the Hague Service Convention. Further, it was not necessary that the complaint be translated into French.[44] Determining that the French defendants were properly served moves the Court's analysis to whether this Court may exercise jurisdiction over them.

II

*Personal Jurisdiction*

■ When a motion to dismiss challenges personal jurisdiction, the plaintiffs have the burden to show the basis for this Court's jurisdiction over a non-resident defendant.[45] Plaintiffs satisfy this burden by making a *prima facie* showing that jurisdiction is conferred by statute.[46] All factual inferences must be viewed in a light most favorable to the plaintiffs.[47]

---

40. *Id.* at 4; *Quinn*, 700 A.2d at 157 n. 14–15.

41. *Id.* at 157.

42. *Id.* at 159.

43. *Eli Lilly and Co. v. Roussel*, D.N.J., 23 F.Supp.2d 460, 474 (1998), *see* Hague Convention, Annex, n. 12 at 128.

44. *Sandoval v. Honda Motor Co., Ltd.*, Pa.Super.Ct., 364 Pa.Super. 136, 527 A.2d 564 (1987).

45. *McKamey v. Vander Houten*, Del.Super., 744 A.2d 529, 531 (1999).

46. *Plummer & Co. Realtors v. Crisafi*, Del.Super., 533 A.2d 1242, 1244 (1987).

47. *Outokumpu Eng'g, Enters., Inc. v. Kvaerner Enviropower, Inc.*, Del.Super., 685 A.2d 724, 727 (1996).

The next step in the jurisdictional analysis involves a two-part test. First, do the actions of the French defendants fall under any of the provisions of Delaware's long arm statute and, if they do, would exercising jurisdiction over them be constitutionally permissible.[48] These two tests are independent.[49] That "independence" has been interpreted to mean that there must first be an analysis under the long arm statute and then a Due Process analysis.[50] In short, unlike other jurisdictions which combine the two tests into determining jurisdiction on that basis alone,[51] Delaware must go through the two-test analysis.

## A

The first test is whether there is a statutory basis for jurisdiction. The plaintiffs rely upon several parts of Delaware's long arm statute, namely:

(c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:

(1) Transacts any business or performs any character work or service in the State;

\* \* \* \* \* \*

(3) Causes tortious injury in the State by an act or omission in this State;

(4) Causes tortious injury in the State or outside of the State by an act or omission outside the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State;[52]

Plaintiffs cannot utilize subsection (c)(3) to obtain jurisdiction over the French defendants. That subsection only applies when a defendant or an agent of the defendant performs some act (or omission) in Delaware.[53] Therefore, the analysis turns to the remaining two subsections.

There are, however, some facts, in addition to those cited earlier, which need to be stated before the legal analysis is undertaken. The French defendants have supplied the affidavit of Milward, corporate counsel for LLS and SA. Neither of these two entities, the defendants, nor SUC, Milward states, have employees, officers, directors, agents, offices or real estate in Delaware.[54] Neither LLS, SA, nor SUC sold or marketed goods in Delaware, nor did any of them advertise or solicit business in this state.[55] None of the three have any relationship to any Delaware entity.[56] Nor has any of the three been registered or qualified to do business in Delaware nor had any had a registered agent to accept service.[57]

In addition to these facts, however, are others relating to potential jurisdiction of this Court. Some, found in documents, have already been cited.[58] They show the French defendants' long-standing, determined efforts to market Pondimin in the United States. In fact, as the July 15,

**48.** *Mid–Atlantic Mach. & Fabric, Inc. v. Chesapeake Shipbuilding, Inc.,* Del.Super., 492 A.2d 250, 255 (1985).

**49.** *Hercules, Inc. v. Leu Trust and Banking (Bahamas) Ltd.,* Del.Supr., 611 A.2d 476, 483 (1992).

**50.** *Intel Corp. v. Silicon Storage Tech., Inc.,* D.Del., 20 F.Supp.2d 690, 694–95 (1998).

**51.** *Houghton v. Piper Aircraft Corp.,* Ariz. Supr., 112 Ariz. 365, 542 P.2d 24 (1975).

**52.** 10 *Del. C.* § 3104.

**53.** *Sears, Roebuck & Co. v. Sears plc.,* D.Del., 744 F.Supp. 1297, 1302 (1990).

**54.** Milward Affidavit (September 21, 1999) ¶s 17, 23, 24.

**55.** *Id.* at ¶s 18, 19.

**56.** *Id.* at ¶ 20.

**57.** *Id.* at ¶ 21, 22.

**58.** *Supra* at 5–6.

1995 SA letter to Wyeth indicates,[59] the marketing in the U.S. was but part of the French defendants' and related entities' world-wide marketing plans and efforts. In short, these defendants made a conscious decision with which they followed through to have Pondimin (fenfluramine) marketed in the United States. No state was excepted from that effect.

The record shows, as the defendants contend, that it was the American entities, however, which manufactured Pondimin. The drug was not manufactured in France, delivered in France or the United States and then distributed in the United States. The American entities did the manufacturing and the marketing. But, even the earlier-cited documents manifest the French defendants' continuing involvement in the manufacture, distribution, regulation and use of the drugs they licensed the American entities to manufacture and sell. For instance, there is a June 7, 1995 SA letter to Wyeth enclosing a fenfluramine (Pondimin) report concerning adverse drug reactions for the month of April 1995. A June 16, 1995 Wyeth letter to SA states it is time to submit the annual periodic report for Pondimin to the FDA. The letter states, "[p]art of this review involves calculations to determine if an increased frequency of serious, expected adverse events has occurred during the reporting period." The letter asks for sales figures for fenfluramine in Belgium for specified periods. SA sent to Wyeth a copy of a European Union agency's report about a possible causal connection between fenfluramine and primary pulmonary hypertension.

LLS and SUC were even sued in 1973 by SKF over a patent infringement involving fenfluramine. This circumstance and these other documents show the French defendants engaged in a years-long pattern of pushing their product into and throughout the U.S. market. And, their efforts were more than licensing. They were involved in introducing a product into a tightly-regulated market, a market regulated by the FDA. Not only were the French defendants aware of that but they helped in the process and participated in the ongoing nature of the regulatory process. In sum, these documents show more than a foreign manufacturer's introduction of its product into the U.S.; it was a product subject to significant regulatory process in which the foreign entities were involved and with which they were familiar.

There is more documentation in the record showing the French defendants' intent to distribute Pondimin in the United States:

1. A Consent Amendment Agreement of LLS, another French-related company Orsem, American Home Products and others effective November 21, 1994. While the agreement amends prior agreements dealing with Redux (dexfenfluramine), it contains this language:

III. Notwithstanding the provisions of Paragraph 9.4.4 of the Sublicense Agreement, American Cyanamid Company, Interneuron Pharmaceuticals, Inc. and Les Laboratories Servier agree that American Home Products Corporation shall be free to continue to market Pondimin and Mazindol subject to the following requirements: (1) for as long as Dexfenfluramine remains commercially viable, American Home Products Corporation will differentiate Dexfenfluramine for promotional and marketing purposes and will not promote or market Pondimin or Mazindol or any other product for the anti-obesity indication which competes directly with Dexfenfluramine in a manner in each case which negatively affects the existing or future market for Dexfenfluramine, and (2) the provisions of this Section III will not apply to any product which American Cyanamid has under development as of February

59. *Supra* at 5.

10, 1995, as to which Paragraph 9.4.4 of the Sublicense Agreement will apply.[60]

M. Derome–Tremblay signed the Consent Agreement on behalf of LLS as its vice-president. In 1996, she is also listed on a separate document as SA's president.[61]

2. A July 15, 1996 SA letter to Wyeth's product director listing the Pondimin registration numbers and marketing dates in countries around the world. For the U.S., the registration date was June 1973, the NDA number was 16–618 and the marketing date was July 1973.

3. There is a February [date illegible] 1996 SA letter to Wyeth memorializing a telephone conversation between representatives of the two the day before. Among other subjects discussed was Redux and fenfluramine (Pondimin) supply.

4. The MDL opinion considering LLS's motion to dismiss cites a 1993 Wyeth document mentioning that M. Derome–Tremblay was interested in buying back Pondimin for the U.S. and Canada. There was some discussion of financial terms.[62]

5. An undated and unlabeled chart showing Pondimin sales in all fifty states. In whatever period is covered by this information, there were 22,191 Pondimin prescriptions written in this State. They represent .19 percent of Pondimin's total U.S. prescriptions. Only Hawaii and Vermont had fewer.[63]

■ The activities described in these additional documents, and those activities discussed in the earlier documents, give this Court jurisdiction over the French defendants. The bases of its holding on what the record shows is the French defendants' involvement in the United States up to May 1996. While some documents referred to are dated after that, they refer to events prior to May 1996. The plaintiffs have produced other documents showing the French defendants' continued involvement with the FDA and Wyeth after May 1996. In short, the years-long pattern pre-May 1996 continued. In finding jurisdiction exists, this Court finds the earlier decision of *Boone v. Oy Partek, Ab,*[64] as persuasive. While persuasive, there are some important factual differences which make the jurisdictional analysis in this case one of first impression.

The facts in *Boone* involved asbestos which was mined in Finland. A Finnish corporation then sold it F.O.B. Helsinki to its exclusive U.S. Distributor. That distributor, over which the Finnish corporation had no control, shipped the asbestos to various U.S. ports. That distributor sold it to customers in the U.S., including the two Delaware customers also sued in *Boone.*

In this case, the French defendants manufactured nothing. They granted licenses to several U.S. entities to manufacture Pondimin which was done in the U.S. In determining, however, that this Court had jurisdiction over the defendant Finnish corporation in *Boone,* this Court relied upon the stream of commerce approach.[65] Based on the stream of commerce approach, the *Boone* court found specific and general long arm jurisdiction under §§ 3401(c)(1) and (4)[66] stating:

---

**60.** Consent Agreement at 5.

**61.** *Supra,* Item 2, at 5.

**62.** *In Re: Diet Drugs, supra,* n. 1.

**63.** The Court is distressed by plaintiffs' counsel's failure in identifying this document, not providing information as to dates covered, the sources of the information and, obviously, redacting a portion of it. Those acts diminish its importance in this difficult process of sorting out the complex issues raised by the French defendants' motion to dismiss.

**64.** Del.Super., 724 A.2d 1150 (1997); *aff'd.,* Del.Supr., No. 409, 1997, 1998 WL 138690, Holland, J. (February 12, 1998) (ORDER); *cert. denied* 524 U.S. 939, 118 S.Ct. 2345, 141 L.Ed.2d 716 (1998).

**65.** *Id.* at 1157–58.

**66.** *Id.*

This Court concludes that Delaware's long arm statute, *via* §§ 3104(c)(1) and (c)(4), provides for the exercise of jurisdiction over Partek. Under § 3104(c)(4) Partek exhibited an intent and purpose to serve the Delaware market. Plaintiff has shown that Partek engaged Huxley to be its exclusive distributor of asbestos to the United States. Implicit in this agreement is the fact that Huxley solicit business from the Country as a whole, including Delaware. The result of this solicitation, according to plaintiff, is that Partek earned at least $270,000 from its sales of asbestos and was shipping up to 50 tons per month of asbestos into this State over the course of ten years. Thus, not only did Partek implicitly solicit business from Delaware, it also derived substantial revenue from Delaware and engaged in a persistent course of conduct in this State. Additionally, it is clear that § 3104(c)(1) is satisfied in this instance. Partek's actions resulted in asbestos being shipped into this State at the rate of 50 tons per month over the course of 10 years and plaintiffs' claims arise out of their exposure to this asbestos. Consequently this Court concludes that plaintiffs have met their burden of showing 10 *Del. C.* § 3104 confers judgment over Partek in this case.[67]

In reaching this dual jurisdictional holding, the court in *Boone* relied upon the facts and some *dicta* in *LaNuova D & B, S.p.A. v. Bowe Co., Inc.*[68] In *LaNuova,* an Italian company manufactured roofing material where title passed to its U.S. distributor, a New Jersey corporation. The roofing material was then shipped from Italy to that distributor which had the exclusive U.S. East Coast distribution rights. The Italian manufacturer signed a blank warranty provided by that manufacturer which was secured by insurance the manufacturer obtained. There was a fire in this state in which the roofing material was involved. Up to the time of that fire, only two warranties had been issued in Delaware. Neither, however, had been given to the plaintiff in *LaNuova.*

The Supreme Court in *La Nuova* upheld this Court's holding that personal jurisdiction existed under § 3104(c)(4).[69] But in so holding the Supreme Court, in a footnote, said:

> It is conceivable that a tort claim could enjoy a dual jurisdictional basis under (c)(1) and (c)(4) if the indicia of activity set forth under (c)(4) were sufficiently extensive to reach the transactional level of (c)(1) and there was a nexus between the tort claim and transaction of business or performance of work.[70]

*Boone* and *LaNuova,* especially this footnote, apply here. While it is unclear what period, for instance, is covered by the figures showing 22,191 prescriptions written in Delaware for Pondimin, there is a clear pattern of repeated activity in this State. Admittedly, that number pales in significance in the same—*albeit,* again, unknown—period for all of U.S. prescriptions, 11,584,797. But, the prescription figures for Delaware show far more than two or so transactions such as in *LaNuova.* In short, the dual jurisdictional holding in *Boone* and the dual jurisdictional *dicta* in *LaNuova* demonstrate that the French defendants in this case are subject to jurisdiction under §§ 3104(c)(1) and (c)(4).

The French defendants, however, seek to analogize their relationship with their American distributors to cases involving intellectual property where courts have held personal jurisdiction does not exist. Primarily, they rely upon patent infringement cases. To the extent they held patents and licensed their product for manufacture in the United States, there is an

---

**67.** *Id.* at 1158.

**68.** Del.Supr., 513 A.2d 764 (1986).

**69.** *Id.* at 769.

**70.** *Id.* at 768 n. 3.

initial attraction to their argument. One such case is *Intel Corp.*[71] Intel is a Delaware corporation that sued Silicon Storage Technology [SST], a California corporation, for patent infringement over flash memory chips. SST had no employees here, had never contracted with anyone in Delaware, nor was it licensed to do business here and had no sales in Delaware (at least until a law clerk of plaintiff's counsel ordered some computer hardware containing the product at issue). SST's only solicitation of business in Delaware was, arguably, through ads in national magazines. This, the Court held, was insufficient to create jurisdiction under § 3401(c)(1).[72] An agent of SST sent sales representatives to Delaware and many other states but they had not solicited customers for SST. None of this was sufficient to create jurisdiction.[73]

Another patent infringement case upon which the French defendants rely is *Red Wing Shoe Co. v. Hockerson–Halberstadt, Inc.*[74] A Minnesota company filed a declaratory judgment action of non-infringement. This was to stop a claim of patent infringement by a Louisiana company whose only connection to Minnesota appears to have been a letter from a Louisiana corporation stating there was a patent infringement and offering a licensing deal. This was insufficient to create jurisdiction.[75]

These cases do not help the French defendants. In both cases, the contacts with the state where jurisdiction was sought were minimal, at best. The patent claims do involve intellectual property and so may the French defendants' contracts with the various U.S. distributors. But,

those contracts are not at issue. Those contracts, instead, show a long-standing effort to bring Pondimin to the U.S. market, including Delaware. There were no isolated and random sales.

In sum, the Court finds that §§ 3401(c)(1) and (c)(4) provide a basis for jurisdiction over the French defendants.

## C

▮ Having determined there is a statutory basis for jurisdiction, the Court must next determine whether exercising it is consistent with the Due Process Clause of the United States Constitution.[76] The analysis of this issue requires this Court to determine whether the French defendants had the requisite minimum contacts with Delaware and, if so, whether asserting jurisdiction over them is fair and reasonable.[77] This latter test also is a determination of whether these defendants had a fair warning that their activities may subject them to suit here.[78] The fair warning component can be satisfied if it is shown the French defendants have purposefully directed their activities to Delaware.[79]

▮ This Court is satisfied all of the requirements of Due Process are met in this case. This Court reaches that result despite the United States Supreme Court's plurality opinion in *Asahi Metal Ind. v. Super. Ct. of Cal., Solano Cty.*[80] Asahi was a Japanese company which manufactured tire valves and, among other companies to which it sold its valves, it sold them to a Taiwanese company which used them in making its tires. Some of those tires were sold in the U.S., including California.

**71.** 20 F.Supp.2d 690.

**72.** *Intel Corp.*, 20 F.Supp.2d at 696.

**73.** *Id.* at 697.

**74.** D.Minn., 966 F.Supp. 833 (1997).

**75.** *Id.* at 839.

**76.** *Waters v. Deutz Corp.*, Del.Super., 460 A.2d 1332 (1983).

**77.** *Boone*, 724 A.2d at 1158.

**78.** *Outokumpu*, 685 A.2d at 731.

**79.** *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473–74 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

**80.** 480 U.S. 102, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

There was an automobile accident in California in which a tire was implicated. The Taiwanese company was sued and, in turn, sued Asahi for indemnification. The plurality opinion phrased the issue this way:

> This case presents the question whether the mere awareness on the part of a foreign defendant that the components it manufactured, sold, and delivered outside the United States would reach the forum State in the stream of commerce constitutes "minimum contacts" between the defendant and the forum State such that the exercise of jurisdiction "does not offend 'traditional notions of fair play and substantial justice.' "[81]

The "stream of commerce" doctrine finding jurisdiction consistent with Due Process came from *dicta* in *World–Wide Volkswagen Corp. v. Woodson.*[82] Under the facts recited above, a plurality held that the stream of commerce doctrine did not supply the Due Process connection to California. Among the factors cited for so holding, the Court said Asahi did not "create, control, or employ the distribution system that brought [Asahi's] valves" into California.[83] The plurality did say that if Asahi had used a distributor who agreed to market its products in California, Due Process may be satisfied.[84] The majority of the justices, however, relied upon the fairness doctrine to uphold California's lack of jurisdiction over the Taiwanese manufacturer's indemnification action against the Japanese manufacturer.

Based on *Asahi* alone, the minimum contacts' test has been met in this case. First, this is a direct action, not one of indemnification, at least as far as the plaintiffs' underlying action. Second, these defendants' actively and affirmatively sought to introduce their products into the United States. This was not an indirect routing as in *Asahi*. Third, the French defendants utilized exclusive manufacturers and distributors to reach all fifty states.

Three cases decided since *Asahi* illustrate that these factors satisfy the Due Process standards. One is *A. Uberti & C. v. Leonardo In & for Pima.*[85] In that case, an Italian company made a particular .357 magnum which was a replica of an 1873 Colt gun. The same safety defect of that gun, to preserve authenticity, was retained. This defect caused this particular model to discharge when dropped and, in this instance, when dropped, discharged causing the death of a child. The Italian company had an exclusive U.S. distributor but had no offices in Arizona or other physical presence there. In finding jurisdiction existed, the Court said it was employing the Due Process test stated in *Asahi:*

> The "substantial connection," between the defendant and the forum State necessary for a finding of minimum contacts must come about by *an action of the defendant purposefully directed toward the forum State.* The placement of a product into the stream of commerce, without more, is not an act of the defendant purposely directed toward the forum State.[86]

The *A. Uberti* court went on to state that the Italian company intentionally manufactured its products for the U.S. market. It utilized a distributor knowing those products would flow into local markets.[87] The Italian company and U.S. dis-

---

**81.** *Id.* at 105, 107 S.Ct. at 1028, *citing International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (*quoting Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)).

**82.** 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980).

**83.** *Asahi* at 112, 107 S.Ct. at 1032.

**84.** *Id.*

**85.** 181 Ariz. 565, 892 P.2d 1354 (1995).

**86.** *Id.* at 1359 (*quoting Asahi,* 480 U.S. at 112, 107 S.Ct. at 1032).

**87.** *A. Uberti,* 892 P.2d at 1360.

tributor's relationship was not an isolated transaction but an ongoing one.[88] Unlike *Asahi*, where the Japanese manufacturer had little control, if any, over where its product ultimately went, the Italian gun manufacturer targeted the U.S.[89]

The court's analysis turned to the connection to Arizona. The Italian gun manufacturer argued there, as the French defendants do here, that there was no activity addressed specifically to Arizona. In reply, the Arizona court said:

> Defendant argues that its activities, at best, focused on the United States in general, not Arizona. Therefore, Arizona exceeds due process by asserting its jurisdiction here. Were this true, then no individual state could assert jurisdiction over Defendant simply because Defendant did not target a particular state or group of states but instead intended to sell its product to all of America. The argument turns common sense on its head. Holding that a defendant intending to sell its products to any and all citizens in the United States could not be held accountable in any jurisdiction where its products caused injury defies any sensible concept of due process.[90]

The court continued by saying that the plaintiffs did not have to show an intent to sell in Arizona, only an intent to sell in America was needed.[91] There was no effort to restrict the geographic location where the U.S. distributor sold the Italian-made guns. To allow a foreign manufacturer to insulate itself by using an intermediary would, the court said, itself undermine Due Process.[92]

There are many similarities of *A. Uberti* to this case. The French defendants employed an exclusive U.S. distributor. There was an open, direct, intentional and planned effort to penetrate the U.S. market for diet pills. The market for those seeking to reduce weight by taking a pill is at least as attractive as it was for collectors of replica western guns, but probably far larger. The exclusive U.S. distributors had no restrictions on their sales; no state was excluded. The involvement in the U.S. market for Pondimin was over years and not isolated. That the gun in *A. Uberti* was specifically designed for the U.S. market but Pondimin was distributed world wide is of no help to the French defendants. Their activities with the U.S. market were extensive and prolonged and it was a market they sought. Equally unavailing is their contention they did not manufacture Pondimin. The drug was only manufactured because they granted the license to do so.

The reasoning in *A. Uberti*, therefore, applies with equal force here. So, too, does the reasoning in *Tobin v. Astra Pharmaceutical Prod., Inc.*[93] The defendant challenging jurisdiction under Kentucky law was a Dutch manufacturer, Duphar, of ritodrine. Duphar had submitted a NDA to the FDA for this drug and came to the U.S. to help in studies to get FDA approval. Duphar licensed an American manufacturer to distribute the drug throughout the U.S. The two companies were to coordinate efforts in dealings with the FDA and information-sharing with the FDA.

First, the *Tobin* court found that using an independent distributor was not a basis for insulation from suit.[94] The court noted Duphar's involvement in getting the new drug application and tests in the U.S. Second, it cited Duphar's planned penetration of the U.S. market, which, it said, was

---

**88.** *Id.* at 1361.

**89.** *Id.*

**90.** *Id.* at 1362.

**91.** *Id.*

**92.** *Id.* at 1363.

**93.** 6th Cir., 993 F.2d 528 (1993), *cert. denied sub nom. Duphar v. Tobin*, 510 U.S. 914, 114 S.Ct. 304, 126 L.Ed.2d 252 (1993).

**94.** *Id.* at 544.

purposeful availment of the privilege of acting in or causing consequences in the forum state.[95] Third, in reply to Duphar's argument that it had not specifically directed activities to Kentucky, the court said:

> Duphar argues that it has done nothing in particular to purposefully avail itself of the Kentucky market as distinguished from any other state in the union. If we were to accept defendant's argument on this point, a foreign manufacturer could insulate itself from liability in each of the fifty states simply by using an independent national distributor to market its products, a result we specifically rejected in *Poyner*. Duphar cannot deny that by licensing Astra to distribute ritodrine in all fifty states it employed the distribution system that brought ritodrine to Kentucky.[96]

The *Tobin* court held that these Due Process considerations did not prevent jurisdiction.

The third post-*Asahi* case is *Barone v. Rich Bros. Interstate Display Fireworks Co.*[97] The plaintiff was injured in a fireworks explosion in Omaha, Nebraska, and sued the distributor, a South Dakota company, and the manufacturer, a Japanese company. The South Dakota company was one of several distributors the Japanese manufacturer had throughout the U.S. The South Dakota company's market territory included Nebraska. The court said the South Dakota distributor, and others the Japanese company utilized, had evidenced the manufacturer's efforts to sell in the U.S., thus satisfying Due Process requirements.[98]

The *Barone* court examined this stream of commerce approach in light of *Asahi*. Since a majority of the Supreme Court in *Asahi* did not rely upon that approach to find California had no jurisdiction, the *Barone* court found it to be still viable.[99] Besides, the court noted, unlike *Asahi*, the Japanese manufacturer in *Barone* "poured its products into regional distributors throughout the country."[100] It reaped the benefits of these distributors.[101] The court also noted that this was not a case where the product ended up in a state not served by any distributor.[102] In other words, the *Barone* court was noting the Japanese manufacturer's intentional placement into the forum state, Nebraska, of its products.

This circumstance contrasted to the situation in *World–Wide Volkswagen*[103] where a car purchaser bought his car in one state, took it to another where he was injured in an automobile accident and sued the foreign manufacturer. While finding this circumstance did not comport with Due Process, the United States Supreme Court, as mentioned, noted that delivery of products into the stream of commerce with the expectation of purchase in the forum state can satisfy Due Process.[104]

This Court in *Boone* addressed all these issues in connection with the Finnish asbestos corporation. The utilization of an exclusive distributor was a key factor in finding Due Process minimum contacts.[105] That factor exists here, too. There was an additional factor. Representatives of the Finnish corporation had twice been to Delaware several years prior to the initiation of the *Boone* action. But, this additional factor is insufficient to diminish *Boone's* precedential value to this case. The *Boone*

95. *Id.*

96. *Id.*

97. 8th Cir., 25 F.3d 610 (1994).

98. *Id.* at 614.

99. *Id.*

100. *Id.* at 615.

101. *Id.*

102. *Id.*

103. 444 U.S. at 286, 100 S.Ct. at 561.

104. *Id.* at 297–98, 100 S.Ct. at 567.

105. *Boone*, 724 A.2d at 1160.

court used those visits to show the manufacturer knew its products were being shipped here. The record in this case, like *A. Uberti, Tobin* and *Barone* shows there was an intent of the foreign defendants to get their products into all fifty states. In sum, this Court is satisfied that the Due Process minimum contacts exist.

### C

 But before finding jurisdiction can be exercised, the Due Process analysis has a second part, in addition to minimum contacts. These minimum contacts must be sufficient enough that exercising jurisdiction over a foreign defendant must not offend traditional notions of fair play and justice.[106] There are various factors weighed in considering these principles. They include the burden on the defendant, the interests of the forum state in adjudicating the dispute, the plaintiff's interest in obtaining relief, the interests of the interstate judicial system in effectively resolving disputes and other factors.[107]

Especially important is the burden on the defendant,[108] particularly one from a foreign country.

> The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders.[109]

Each of the courts in *Boone, A. Uberti, Tobin* and *Barone* recognized and weighed this burden but found it not a bar to jurisdiction. The *Boone* court recognized that it would be unfair for an injured Delaware citizen to seek relief in a foreign court.[110] The *A. Uberti* court noted the globalization of the economy and advances in communication technology which reduce

the burden on a foreign defendant.[111] The *Barone* court cited the same factors in finding there was not an undue burden placed on a foreign defendant.[112]

It is the reasoning in the *Tobin* court which shows that there is not an unfair or unreasonable burden placed on the French defendants in this case. *Tobin* noted the Dutch company's familiarity with FDA procedures stating this showed it would "not be lost in our complex system and shows a willingness by [the manufacturer] to expend substantial resources to exploit the United States market." [113]

There is much the same here. These defendants were involved in various ways in the FDA's regulations of their drugs, Pondimin and Redux. M. Derome–Tremblay, president of SA in 1990, at least, and a LLS vice president in 1996 (these are the only dates cited in the record) indicated she knew Pondimin was a schedule IV drug under U.S. law. That Mrs. Wright did not take Redux is irrelevant to this analysis, since the defendants are related, the essential compounds of the drugs are related and the efforts to get into the U.S. market were interrelated. There is more. LLS and SUC were sued in 1973 for patent infringement concerning Pondimin (the drug taken here); a lawsuit which they defended. LLS is a party in the MDL. They have already been sued in two other states, New Jersey and New York.

Under these circumstances, there is no undue or unique burden on these French defendants to defend themselves in a Delaware court. In addition, the interests of Delaware in this case are high. A Delaware citizen who claims injury, and access to its courts has a strong interest to protect. Exercising jurisdiction over these

---

106. *LaNuova*, 513 A.2d at 769.

107. *Boone*, 724 A.2d at 1161.

108. *Id.*

109. *Asahi*, 480 U.S. at 114, 107 S.Ct. at 1033.

110. *Boone*, 724 A.2d at 1161.

111. *A. Uberti*, 892 P.2d at 1364–65.

112. *Barone*, 25 F.3d at 615.

113. *Tobin*, 993 F.2d at 545.

defendants provides a basis for the citizens of this state to protect themselves from a foreign manufacturer which introduced allegedly defective drugs into this state.

In sum, the notions of fair play and justice support exercising jurisdiction over the French defendants. Due Process, therefore, does not prohibit this Court's exercise of jurisdiction over the French defendants.

## III

### Forum Non Conveniens

■ These defendants also have moved to dismiss plaintiffs' claims on the grounds of *forum non conveniens*. They do not seek dismissal on the basis of other pending litigation, even though there is some. The MDL is unavailable to the plaintiffs, as Delaware residents, since one of the defendants there, American Home Products, is a Delaware corporation. Diversity of citizenship is, therefore, lacking.

■ Where there is no other pending litigation, the Court looks at several factors.

(1) the relative ease of access to proof;

(2) the availability of compulsory process for witnesses;

(3) the possibility of the view of the premises;

(4) whether the controversy is dependent upon the application of Delaware law which the courts of this State more properly should decide than those of another jurisdiction;

(5) the pendency or nonpendency of a similar action or actions in another jurisdiction; and

(6) all other practical problems that would make the trial of the case easy, expeditious and inexpensive.[114]

■ The burden is upon a defendant to show overwhelming hardship and inconvenience in order to defeat a plaintiff's choice of forum.[115] Two of these factors are non-starters. There is no premises or place to view as part of this cases. There is also no pending action warranting considerations of deference. But there is one significant factor which the French defendants cite which substantially affects the *forum non conveniens* analysis.

### A

The Milward affidavit states that, as French citizens, these defendants have invoked their right under French law to have these plaintiffs' claims heard exclusively in France.[116]

LLS raised this same legal hurdle in the MDL when claiming *forum non conveniens*. The MDL court initially observed that LLS's invocation of this French law potentially weighed in favor of dismissal for *forum non conveniens*.[117] While acknowledging this French law, the District Court noted that it did not mean that court lacked jurisdiction over LLS.

In explaining the same French law to this Court, LLS and SA confirm that very point. The more detailed explanation about this law is contained in an affidavit of Jean–Yves Garaud.[118] That explanation relates to the potential unenforceability of any judgment not obtained in a French court. Garaud's explanation, however, does not say this Court does not have jurisdiction. In addressing this potential hurdle, the District Court stated:

---

**114.** *Ison v. E.I. duPont de Nemours and Co., Inc.*, Del.Supr., 729 A.2d 832, 837–38 (1999), *citing General Foods Corp. v. Cryo–Maid, Inc.*, Del.Supr., 198 A.2d 681, 684 (1964).

**115.** *Chrysler First Bus. Credit Corp. v. 1500 Locust Ltd. Partnership*, Del.Supr., 669 A.2d 104, 105 (1995).

**116.** Milward Affidavit (September 21, 1999) ¶ 26–31.

**117.** *In Re: Diet Drugs, supra*, n. 1 at 9.

**118.** Exhibit V to French defendants' opening brief.

Here, the potential unenforceability of any United States judgment against LLS carries less weight in view of the fact that this action involves multiple defendants and possible issues of joint and several liability. If LLS and the other defendants are found jointly and severally liable, Plaintiffs could recover their entire judgment against one of these other defendants without ever having to enforce a judgment against LLS.[119]

These observations apply here, too. There is potential joint and several liability. If successful against one or more other defendants, plaintiffs here may be able to recover from those defendants.[120]

The District Court noted an additional factor in surmounting LLS's invocation of the French Code. There was a hint that LLS had assets in the United States, but so far, limited discovery had been undertaken on that issue.[121] Whether these French defendants have assets in the United States has not been argued here, however, as a reason to moot the protection of the French Code.

In any event, it appears these defendants remain as parties in a number of cases in the MDL. LLS is also a party in litigation in the New Jersey Superior Court involving Pondimin and Redux.[122] In that litigation, LLS also raised the issue of *forum non conveniens*. On that ground, it invoked the same provision of the French Code as LLS and SA invoke here. Following New Jersey law used to analyze *forum non conveniens* considerations, the

court declined to dismiss the case.[123] That law differs from Delaware's as there is a closer balancing of interests and a bias in favor of more discovery before the *forum non conveniens'* issue is decided.[124] Based upon further discovery, the *Husa* court said LLS could renew its *forum non conveniens* motion.[125] The point, however, is that the New Jersey court did not dismiss that case based on the French Code.

Interesting enough is a case where LLS prevailed on the issue of lack of personal jurisdiction. The same court *in dicta* stated LLS had not made a case of inconvenience.[126] LLS invoked the protection of the French Code there, too.

In short, no federal or state court has been persuaded yet that the protection of the French Code means a plaintiff's case should be dismissed on the basis of *forum non conveniens*.

### Cryo–Maid Factors

Since two of the *Cryo–Maid* factors are absent, the Court will analyze the remaining factors applicable to this case.

### Ease of Access to Proof

The first factor is relative ease of access to proof. Undoubtedly this factor cuts both ways. Mrs. Wright is a Delaware resident who was allegedly prescribed Pondimin by a Delaware doctor. Proof of her injuries or potential injuries is best made here. Balanced against that, of course, is that some of the records she may need or want to prove her negligence

**119.** *In Re: Diet Drugs, supra,* n. 1 at 9.

**120.** For reasons of international comity, the Court will decline commenting on the notion that a product can be introduced, marketed and pushed for consumption around the world but relief for alleged injuries due to defects can only potentially be obtained in the home country. One wonders if the FDA was told of this *ex post facto* wall-building and whether, by engaging in the activities these defendants did, there was waiver of that "protection."

**121.** *In Re: Diet Drugs, supra,* n. 1 at 9.

**122.** *Husa v. Les Labortoiries Servier,* N.J.Super.Ct.Law Div., Diet Drug Cases, Case 240 (November 12, 1998).

**123.** *Id.* at 14.

**124.** *Id.* at 13, 14.

**125.** *Id.* at 14.

**126.** *Fredericks v. A.H. Robbins Co., Inc.,* N.Y.Supr., Index No. 700000/98 and 120549/98, Freeman, J. (October 25, 1999).

and other claims involving these two defendants are in France. In addressing this factor, just as with the others, the French defendants must show hardship with particularity.[127]

In an attempt to meet that burden, the French defendants cite the obvious. First, discovery would be under the Hague Evidence Convention, to which France and the United States are signatories.[128] They do not indicate how much of a major impediment that means. In the MDL case, this issue was addressed. The court pointed out that the United States Supreme Court has held in *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for the So. Dist. of Iowa,*[129] that both the Hague Evidence Convention and the Federal Rules of Civil Procedure are the law of the U.S.[130] The Supreme Court further stated that the Hague Evidence "Convention was intended as a permissive supplement, not a preemptive replacement, for other means of obtaining evidence located abroad."[131] Nor would a litigant be required to employ first the Hague Evidence Convention to obtain discovery from a foreign litigant.[132] As to discovery supervision, the Supreme Court added:

> American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position. Judicial supervision of discovery should always seek to minimize its costs and inconvenience and to prevent improper uses of discovery requests. When it is necessary to seek evidence abroad, however, the district court must supervise pretrial proceedings particularly closely to prevent discovery abuses. For example, the additional cost of transportation of documents or witnesses to or from foreign locations may increase the danger that discovery may be sought for the improper purpose of motivating settlement, rather than finding relevant and probative evidence. Objections to "abusive" discovery that foreign litigants advance should therefore receive the most careful consideration. In addition, we have long recognized the demands of comity in suits involving foreign states, either as parties or as sovereigns with a coordinate interest in the litigation. American courts should therefore take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state. We do not articulate specific rules to guide this delicate task of adjudication.[133]

This Court is not unfamiliar with issues involving utilization of the Hague Evidence Convention in gathering evidence. In following the dictates of *Societe Nationale,* in a discovery dispute, this Court acknowledged the dual evidence-gathering procedures of the Convention and this Court's Rules of Civil Procedure.[134] In other words, there are means of gathering evidence involving foreign defendants which are not insurmountable.[135]

127. *Parvin v. Kaufmann,* Del.Supr., 236 A.2d 425, 428 (1967).

128. Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, opened for signature, March 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444, 28 U.S.C. § 1781.

129. 482 U.S. 522, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987).

130. *Id.* at 533, 107 S.Ct. at 2550.

131. *Id.* at 536, 107 S.Ct. at 2551–52.

132. *Id.* at 542, 107 S.Ct. at 2555.

133. *Id.* at 546, 107 S.Ct. at 2557.

134. *In Re Asbestos Litigation,* Del.Super., 623 A.2d 546, 550 (1992).

135. *See also Ison,* 729 A.2d at 843.

This Court notes, as did the MDL court, that the French defendants communicated in English with their American associates. They signed English language versions of important contracts. They came to the United States and participated in federal regulatory procedures. In short, they injected themselves in a big way into the American market and legal system. It is most likely that many of the documents the plaintiffs seek here have been or will be produced in the other litigation in which they are involved and may already be translated into English.

Balancing the need to protect a foreign litigant, however, this *Cryo–Maid* factor is, at best, even and certainly not of a particular hardship to the French defendants.

### Availability of Compulsory Process

Insomuch as the above discussion addresses this issue, there is no need to dwell on it further. Processes do exist. If at all a problem, it is not a hardship sufficient enough to defeat the plaintiffs' choice of this forum.

### Applicable Law

Neither side has addressed this factor. It is premature to decide the applicable law. While the French Code is of a different foundation than our common law, this Court cannot say this factor results in a particularized hardship to the French defendants.

### Other Factors

Delaware has a strong preference in favor of affording its citizens, such as a Delaware resident in this case, a judicial forum and respecting their choice of forum.[136] By their arrangements with American licenses and distributors, these defendants caused their product to be marketed and used here. If defective, a Delaware citizen should have the right to litigate here, of course, if all other jurisdictional elements exist. To split off these two defendants from the others and com-pel plaintiffs to proceed in France against only them would be judicial folly, inefficient and much more costly to plaintiffs.

In weighing all the applicable factors for *forum non conveniens,* this Court finds the French defendants have not shown a sufficient hardship to defeat the plaintiffs' choice of forum. Weighing the factors as a whole weighs, instead, in the plaintiffs' favor.

### CONCLUSION

The French defendants' motion to dismiss is DENIED. But, this Court is mindful that the MDL court and the New Jersey Superior Court left the door ajar when they denied similar motions. Those decisions are relatively recent, although no one has informed this Court that there have been subsequent events or opinions reversing their denial of the motions in those cases.

Based on that litigation, it seems unlikely a reversal would occur, at least at the trial level. Prudence suggests this Court too, should leave a crack in the door, even though a "denied" sign is hung on it. Should subsequent discovery reveal a sufficient basis for the French defendants to renew their motions, this Court will entertain them. But, the new or additional information must be sufficient to avoid other consequences.

In sum, for the reasons stated herein, the motion to dismiss of Les Laboratories Servier and Servier Amerique is DENIED. Defendants Les Laboratories Servier and Servier Amerique shall file an answer within twenty days from the date of this decision.

---

**136.** *Monsanto Co. v. Aetna Casualty and Sure-* *ty Co.,* Del.Super., 559 A.2d 1301 (1988).