## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SUSTAINABLE ENERGY GENERATION GROUP, LLC, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 8524-VCP |
| PHOTON ENERGY PROJECTS B.V., PHOTON ENERGY N.V., and PHOTON ENERGY INVESTMENTS N.V., | ) ) ) ) | |
| Defendants. | ) ) ) | |

## MEMORANDUM OPINION

Submitted: January 14, 2014
Decided: May 30, 2014

Richard P. Rollo, Esq., Kevin M. Gallagher, Esq., RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Michael C. Hefter, Esq., BRACEWELL & GIULIANI LLP, New York, New York; *Attorneys for Plaintiff*.

M. Duncan Grant, Esq., Christopher B. Chuff, Esq., PEPPER HAMILTON LLP, Wilmington, Delaware; *Attorneys for Defendants*.

**PARSONS, Vice Chancellor.**

This action arises from the exchange of confidential information between entities in the alternative energy industry. The plaintiff, an entity incorporated and based in Delaware, was solicited by the defendants, a group of related Dutch companies, to partner on solar energy projects in the United States. After an in-person meeting between representatives from both sides, a confidentiality agreement was executed and the plaintiff shared purportedly confidential information with the defendants. The plaintiff and the defendants, however, were unable to partner successfully on any projects. The plaintiff alleges that the defendants never intended to partner with it, but instead were interested only in using the plaintiff's confidential information to help them raise capital through a bond offering. As a result, the plaintiff has asserted claims for breach of the confidentiality agreement, misappropriation of confidential information, and tortious interference with prospective business opportunities. The plaintiff seeks, among other relief, monetary damages for the defendants' tortious interference and an injunction prohibiting the defendants from any further use or disclosure of its confidential information.

The defendants have moved to dismiss the complaint in its entirety on the grounds that this Court lacks personal jurisdiction over them and that the plaintiff failed to provide them with adequate service of process. In addition, the defendants argue that the plaintiff has failed, in each count of the complaint, to state a claim upon which relief can be granted.

Having considered the parties' briefs and heard argument on the motion, I conclude that the defendants' motion to dismiss should be granted with respect to Count

V of the complaint for tortious interference with a prospective business relationship. In all other respects, the motion to dismiss is denied.

## I. BACKGROUND

### A. The Parties

Plaintiff, Sustainable Energy Group, LLC ("SEG"), is a Delaware limited liability company with its principal place of business in Hockessin, Delaware. SEG is a renewable energy company specializing in energy engineering and the development of renewable energy projects.

Defendant Photon Energy N.V. ("Photon") is a Dutch corporation that develops renewable energy power projects around the world and operates through several subsidiary entities. Defendants Photon Energy Projects B.V. ("PEP") and Photon Energy Investment N.V. ("PEI," and together with Photon and PEP, "Defendants") are both Dutch corporations and wholly owned subsidiaries of Photon. Photon, PEP, and PEI each have their principal place of business in Amsterdam, The Netherlands.

### B. Facts[1]

#### 1. Photon approaches SEG

In October 2012, Photon approached SEG about potentially working together on a sustainable energy project. At the time, SEG was developing similar projects on the East Coast of the United States in Delaware, New Jersey, Pennsylvania, and Vermont. On

---

[1] Unless otherwise indicated, the facts recited in this Memorandum Opinion are based on the allegations in Plaintiff's complaint, documents integral to or incorporated in the complaint, or facts of which the Court may take judicial notice.

October 18, 2012, Peter Novotny, Photon's co-founder, and Jeff Fry, a Photon executive, traveled to the United States to meet with Peter Burcat and Pierre D'Amours, SEG's principals.

After landing in Philadelphia, Novotny and Fry met Burcat and D'Amours at SEG's pipeline project in Northeast Philadelphia. From there, the group went on to see SEG's pipeline projects in Millville, New Jersey, and in Milford, Delaware. At the end of the day, the group met in Wilmington, Delaware to discuss a potential business transaction between the two parties. During the meeting in Wilmington, Novotny and Fry disclosed that Photon was planning to raise capital through a bond offering in Europe, and that they believed the success of the offering depended, at least in part, on SEG being able to show growth in its global pipeline of renewable energy projects. Novotny and Fry also indicated that when they left Delaware, they would be traveling to New York to discuss the potential bond offering with investment professionals.

Subsequent to the Delaware meeting, the parties continued to discuss a potential transaction. The discussions occurred primarily by email, telephone, and Skype between SEG's offices in Delaware and Photon's offices in Europe. As talks between the parties progressed, they decided to execute a non-disclosure agreement (the "NDA"). After exchanging drafts between their respective offices, on November 29, 2012, SEG and PEP entered into the NDA.

## 2.  The terms of the NDA

Under the NDA, which is governed by Delaware law, SEG and PEP agreed "to hold in confidence and refrain from the unauthorized use of any confidential or proprietary information of the other party."[2] "Proprietary Information" is defined as:

> [A]ll information concerning the business and affairs of a party, including but not limited to, any and all proprietary information, trade secrets, product specifications, data, know how, formulae . . . expansion plans (e.g. existing, and new entry into new, geographic and/or product markets); locations of new offices (including proposed locations) . . . whether furnished or learned before or after the date hereof, whether oral, written or electronic, and regardless of the manner or form in which it is furnished and learned, customer names and financial information, business records, financial statements, files, documents in any format, videos, spreadsheet, and Proprietary Information received from Representatives of the Parties.[3]

SEG and PEP also agreed that "[a]ll Proprietary Information shall remain the sole and exclusive property of the disclosing party and nothing in this Agreement, or any course of conduct between the Parties shall be deemed to grant to the receiving party any license or rights in or to the Proprietary Information"[4] of the disclosing party.

Under Section 1(b) of the NDA, the parties also specified that Proprietary Information did not include information that:

> (i) [w]as available to the public prior to the time of disclosure;
> (ii) becomes available to the public through no act or

---

[2]    Compl. ¶ 22.

[3]    *Id.* ¶ 23.

[4]    *Id.* ¶ 25.

4

omission of the other party or its Representative; (iii) is communicated rightfully and explicitly to the other party free of any obligation of nondisclosure and without restriction as to its use; (iv) was in the other party's possession and obtained on a non-confidential basis prior to its disclosure by the disclosing party or its Representatives; or (v) is independently developed by the other party without reference to or use of the Proprietary Information of the disclosing party.

The underlying purpose of the NDA appears to have been to facilitate the exchange of confidential and proprietary information so that each party could evaluate "whether to enter into the Transaction[5] and, if such Transaction is consummated, how best to effect such Transaction."[6]

### 3. The Burlington and Woolwich Township projects

At some point after the parties met in Delaware, SEG, with Photon's consent, represented to the owners of sustainable energy projects in Burlington and Woolwich Township, New Jersey, that Photon was interested in proceeding with an investment in each of those respective projects.

### a. The Burlington project

On November 28, 2012, Filippo Lambert, a Director at Photon, emailed Burcat and D'Amours laying out a "schedule of needed actions" that needed to be completed before work could begin on an 8.1-megawatt solar project in Burlington, New Jersey.

---

[5] The NDA defines the Transaction as a "possible business relationship or transaction" between SEG and PEP. Defs.' Opening Br. Ex. E at 1.

[6] Compl. ¶ 24.

A few weeks later, after Photon had the opportunity to conduct significant due diligence on the project, D'Amours noted in a December 19, 2012 email to Fry that the Burlington project owner was continuing to ask for documentation verifying that the funding to be provided by Photon, which was needed to launch the project, was in place. D'Amours informed Fry that the project owner would not continue producing relevant documents unless it received assurances of Photon's commitment to fund the project. That same day, Burcat wrote to Lambert and D'Amours expressing a similar sentiment: the Burlington project owner would not continue to provide due diligence materials unless Photon delivered "the single financial document" that the owner requested confirming Photon's commitment to fund the project. Photon did not provide the requested document or any other document confirming its interest in providing funding.

### b.      The Woolwich Township project

Concurrent with the project in Burlington, SEG and Photon also were in discussions to partner on a 312-kilowatt solar project in Woolwich Township, New Jersey. On November 26, 2012, in a conversation between Burcat, D'Amours, Novotny, and Lambert, Burcat and D'Amours requested that their Photon counterparts send them certain cost-savings spreadsheets by the end of the week.[7] The spreadsheets were to include information that Woolwich's Town Council could use to compare the SEG/Photon bid to that of the project's only other bidder. Burcat and D'Amours wanted

---

[7]     Because, if their bid was successful, Woolwich would be signing a power purchase agreement with Photon, not SEG, Photon was the party that needed to provide the requisite "financial assurances and obligations."

6

to be able to forward that information to the members of the Town Council on November 30, so that they could review it before a scheduled December 3 Town Council meeting, where the project was scheduled to be discussed.

Photon did not deliver the cost-savings spreadsheets to SEG until the night of December 2, 2012. At the December 3 meeting, the Township Solicitor, the Mayor, and three Council members each remarked individually how SEG's failure to provide the Town Council with the requested documents before the meeting was unacceptable and unprofessional. Indeed, the Town Council refused to accept D'Amours's oral representation of the cost-saving figures, informed SEG it was not necessary for them to submit any documents that evening, and summarily dismissed Burcat and D'Amours from the meeting.

Notwithstanding SEG's prior relationship with Woolwich Township, which included SEG previously having completed a solar project for the township and SEG's reliance on the township to provide business references as to the quality of its work, SEG was not chosen for the 312-kilowatt solar project.

### 4. Photon's alleged use of SEG's "Proprietary Information"

The discussions between SEG and Photon and its subsidiaries did not result in the consummation of a transaction or the creation of some other type of business relationship. Nevertheless, pursuant to Section 6 of the NDA, SEG and PEP continue to be bound by its terms.

On February 11, 2013, Photon announced publicly its intention to launch a bond offering, through PEI, on the Frankfurt Stock Exchange. In connection with the

7

prospective bond sale, PEI disseminated a prospectus and a February 2013 investor presentation (the "Bond Investor Presentation") to eligible investors. According to SEG, the Bond Investor Presentation, the bond prospectus, and credit analyst reports concerning the sale of the bonds contain "Proprietary Information" relating to SEG's United States pipeline projects. SEG also denies having authorized the use of its information in the Bond Investor Presentation, the bond prospectus, or credit analyst reports.

After learning of the alleged unauthorized use of its Proprietary Information, SEG sought an explanation from Photon. In a February 24, 2013 discussion, Photon acknowledged that the use of SEG's pipeline project information in the bond solicitation materials was not authorized and pledged to rectify the situation. Since making that pledge, Photon has removed some, but allegedly not all, references to SEG's project pipeline from the bond solicitation materials. Specifically, in its amended investor presentation, Photon continues to refer to at least one SEG project in the United States.

On March 11, 2013, SEG sent Photon and its affiliates a cease and desist letter demanding that they stop using SEG's United States pipeline project information in their bond disclosures without SEG's authorization. In response, Photon invited SEG to participate in a Skype teleconference to discuss the issues raised in the March 11 letter. The next day, on March 12, Burcat, Novotny, and Peter Deege, another Photon representative, participated in a Skype call. According to SEG, Deege stated during this call that including SEG's United States projects in the list of Photon's pipeline projects contained in the bond materials given to investors was "stupid."

Deege and Novotny attempted to convince Burcat that any problematic references to SEG's projects in Photon's bond materials had been removed, but allegedly were unable to respond when Burcat pointed to statements in the revised bond materials that SEG contended violated the terms of the NDA. At the end of the call, Burcat and Deege agreed that the parties should have another call the following day (March 13), so that D'Amours could participate. At the appointed time the next day, Photon failed to join the call or explain its absence.

On March 15, 2013, SEG sent Photon another letter expressing its belief that the bond materials contained at least one impermissible reference to an SEG project and that Photon's failure to join the March 13 follow-up call was "inappropriate." Georg Hotar, Photon's Chief Executive Officer, responded by stating that he would "revert" on March 18. Since Hotar's reply, however, Photon has not responded to any of SEG's requests for information.

## C.     Procedural History

SEG filed its verified complaint (the "Complaint") in this action on May 3, 2013. On July 1, I granted Defendants' motion for enlargement of time to respond to the Complaint until July 10, 2013. On that date, Defendants moved to dismiss the Complaint in its entirety. After full briefing, I heard argument on that motion on January 14, 2014. At the argument, I denied that aspect of Defendants' motion that sought to dismiss the Complaint on the grounds that it had been filed carelessly in Plaintiff's operating, rather than legal, name, but reserved judgment on all other facets of the motion. This

9

Memorandum Opinion constitutes my ruling on the remaining aspects of Defendants' motion to dismiss.

### D.  Parties' Contentions

SEG asserts five claims against various combinations of Defendants.  In Count I, SEG alleges that PEP has breached the NDA by, for example, sharing and using SEG's Proprietary Information.  Count II is the same cause of action, but directed at Photon and PEI.  In Counts III and IV, SEG avers that PEP, and Photon and PEI, respectively, have misappropriated its confidential information through their unauthorized use of its Proprietary Information.  Finally, in Count V, SEG accuses Photon of tortiously interfering with its prospective business relationships with the owner of the Burlington project and with Woolwich Township.

Defendants argue first that this Court lacks personal jurisdiction over them. According to Defendants, they lack the requisite continuous presence in Delaware to be subject to general jurisdiction here and SEG has not alleged that any of its claims "arise from" Defendants' connections with Delaware.  Thus, Defendants deny that they are subject to personal jurisdiction under any aspect of Delaware's Long Arm Statute. Defendants also assert that Plaintiff's attempt to serve them with the Complaint in this litigation through Federal Express and international mail is insufficient under the Hague Convention of the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Convention").

Defendants also have moved to dismiss under Court of Chancery Rule 12(b)(6). As to Plaintiff's breach of contract claims, Defendants aver that Plaintiff has failed to

10

allege adequately that the information disclosed in the bond solicitation materials was Proprietary Information under the NDA. Consequently, Defendants assert that the disclosures in their bond solicitation materials were made consistent with their obligations under the NDA. Regarding the claim for misappropriation of confidential information, Defendants argue, again, that Plaintiff has failed to allege that they used any information in their bond solicitation materials that could be considered proprietary or confidential. Finally, as to SEG's tortious interference claim, Defendants contend that SEG has not pled sufficient facts from which the Court can infer that SEG had a reasonable expectancy of a business opportunity regarding either the Burlington or Woolwich Township projects. In addition, Defendants argue that, to the extent SEG reasonably expected to be awarded either of those business opportunities, the Complaint does not support an inference that Defendants interfered intentionally with either of them.

## II. ANALYSIS

Before examining the substance of SEG's allegations against Defendants, I first must address the procedural questions of whether this Court may exercise personal jurisdiction over Defendants and whether Defendants were served properly in accordance with the Hague Convention. I consider these issues in turn.

### A. Personal Jurisdiction

#### 1. Legal standard

Under Rule 12(b)(2), the plaintiff bears the burden of demonstrating this Court's jurisdiction over a nonresident defendant. When evaluating a 12(b)(2) motion, the court may consider facts and evidence outside of the complaint such as affidavits and any

11

discovery of record.[8]  Whatever record the court considers is construed in the light most favorable to the plaintiff.[9]  If no evidentiary hearing has been held, the plaintiff must make a *prima facie* showing of personal jurisdiction.[10]

Delaware courts use a two-step analysis in determining whether a nonresident party is subject to personal jurisdiction.  First, the court must decide whether the party's conduct falls under Delaware's Long Arm Statute.[11]  The Long Arm Statute is broadly construed to "confer jurisdiction to the maximum extent possible under the Due Process Clause."[12]  If jurisdiction exists under the statute, the next step is to evaluate whether exercising personal jurisdiction over the party in question is consistent with the Due Process Clause of the Fourteenth Amendment.[13]

## 2.       Personal jurisdiction must be established over each individual Defendant

SEG asserts that this Court may exercise personal jurisdiction over Defendants because they have transacted business in Delaware under the meaning of 10 *Del. C.* § 3104(c)(1).  Delaware law requires that a plaintiff demonstrate a statutory basis for

---

[8]      *Ryan v. Gifford*, 935 A.2d 258, 265 (Del. Ch. 2007).

[9]      *Id.*

[10]     *Id.*

[11]     *AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 437 (Del. 2005); 10 *Del. C.* § 3104(c).

[12]     *Hercules Inc. v. Leu Trust & Banking (Bahamas) Ltd.*, 611 A.2d 476, 480 (Del. 1992).

[13]     *Id.*

12

personal jurisdiction as to each individual defendant.[14] Although the three Defendants in this case appear to be part of the same corporate family, there is no dispute that they are distinct corporate entities.[15] In an apparent attempt to avoid its burden of making a *prima facie* showing that this Court has personal jurisdiction over each of Photon, PEP, and PEI, SEG, in a single sentence in a footnote of its answering brief, half-heartedly asserts that at least some of Defendants, without specification, are subject to jurisdiction under the "conspiracy theory" of personal jurisdiction.[16]

The manner in which SEG has purported to invoke the conspiracy theory of jurisdiction demonstrates a surprising lack of awareness of, or regard for, this Court's repeated admonitions that the conspiracy theory is a "strict test that should be construed narrowly" and requires "factual proof of each" of the five elements enumerated in *Istituto Bancario*. Because SEG, in its briefing and the Complaint, makes no effort to demonstrate the factual grounds for its conspiracy theory of jurisdiction argument beyond merely invoking the doctrine itself, SEG has failed to present a *prima facie* case that this Court may exercise jurisdiction over any of Defendants on the basis of that doctrine.[17]

---

[14] *Metro. Life Ins. Co. v. Tremont Gp. Hldgs. Inc.*, 2012 WL 6632681, at *6 (Del. Ch. Dec. 20, 2012).

[15] SEG has not advanced any veil piercing or alter-ego type argument that Defendants' independent corporate forms should be disregarded.

[16] Pl.'s Answering Br. 13 n.2 (citing *Istituto Bancario Italiano SpA v. Hunter Eng'g Co.*, 449 A.2d 210 (Del. 1982)).

[17] In that regard, SEG has not explained, in any way, how Photon, PEP, and PEI, either conspired with or aided and abetted one another. Such allegations are of

13

Therefore, I must address separately as to each of the Defendants whether it is subject to personal jurisdiction in Delaware under the Long Arm Statute.

### 3. Photon is subject to personal jurisdiction under 10 *Del. C.* § 3104(c)

Photon is alleged to have breached the NDA, misappropriated SEG's Proprietary Information, and tortiously interfered with SEG's business opportunities in Burlington and Woolwich Township. Thus, the relevant inquiry in determining whether Photon is subject to personal jurisdiction in Delaware under the Long Arm Statute is whether: (1) Photon "transacted business" in Delaware; (2) SEG's claims against Photon "arise from" that transaction of business; and (3) exercising jurisdiction over Photon comports with due process. I discuss these issues in turn.

---

particular importance in cases like this where the plaintiff is alleging, at least in theory, the existence of a conspiracy between a parent entity and its wholly owned subsidiaries or a conspiracy among corporate affiliates. Concluding that it would be proper to exercise personal jurisdiction over a parent company on the grounds that it conspired with its wholly owned subsidiary or subsidiaries implicates "particular concerns" that SEG has failed to address in a meaningful way. *See Red Sail Easter Ltd. P'rs, L.P. v. Radio City Music Hall Prods., Inc.*, 1991 WL 129174, at *4 (Del. Ch. July 10, 1991) ("A theory of personal jurisdiction based upon an alleged conspiracy between a foreign corporation and its wholly owned Delaware subsidiary is very close to being merely another way to assert that a controlling shareholder may always be sued in Delaware on any claim made against the subsidiary. A controlling shareholder does by definition control (or have the power to control) the acts of its subsidiary. Thus, an attempt to apply a conspiracy theory to parent-subsidiary corporations in order to extend the reach of Section 3104 raises particular concerns.").

### a. Photon transacted business in Delaware

"Delaware courts have arguably taken an expansive view of what constitutes 'transacting business' in Delaware."[18] While a defendant's physical presence in Delaware often weighs heavily in favor of finding that a defendant transacted business in Delaware, such physical presence is by no means necessary to support a finding of personal jurisdiction under the Long Arm Statute.[19] Moreover, a "transaction" need not actually be consummated for the Long Arm Statute to apply; the solicitation of business can satisfy the requirements of Section 3104(c)(1), particularly in situations where the solicitation "is directed to and received in Delaware."[20]

---

[18] *Boulden v. Albiorix, Inc.*, 2013 WL 396254, at *6 n.59 (Del. Ch. Jan. 31, 2013).

[19] *See AeroGlobal Capital Mgmt., LLC v. Cirrus Indus., Inc.*, 871 A.2d 428, 440 (Del. 2005) ("While evidence of physical presence may be helpful in determining a party's intent to transact business and to show the actual transaction of business in this State, we hold that such evidence is not the *sine qua non* for jurisdiction under Delaware's Long Arm Statute."). *See also NRG Barriers, Inc. v. Jelin*, 1996 WL 377014, at *3 (Del. Ch. July 1, 1996) ("Furthermore, Defendants rely too heavily on 'physical ties to Delaware.' I find an analytical approach based upon facts denoting physical presence is an increasingly anachronistic methodology for determining whether the transaction of business occurred in Delaware. The advent of superior communications technology lessens the need for face-to-face encounters in the business context. Facsimile machines, video conferencing, electronic mail, and super computing are liberalizing the traditional idea of 'transacting business' in Delaware and other states.").

[20] *Enter. Pub., Inc. v. Janov*, 1990 WL 96569, at *3-4 (Del. Super. July 9, 1990). *See also Mumford v. Carey's Diesel, Inc.*, 1995 WL 108885, at *2 (Del. Super. Feb. 6, 1995) ("The Delaware Long-Arm statute is closely modeled after the Illinois statute. Illinois courts have held that when a defendant initiates a transaction by seeking out a citizen of Illinois to propose a business transaction, the statute is satisfied.").

15

In this case, SEG has alleged that: (1) Photon approached SEG about potentially partnering on a solar development project; (2) two Photon representatives traveled to the United States to meet with SEG's principals in furtherance of their professed desire to partner with SEG; (3) the meetings with SEG included tours of some of SEG's pipeline projects, including one in Milford, Delaware; (4) the meetings also included a dinner in Wilmington, Delaware where the parties discussed a potential business transaction; and (5) following the in-person meeting, Photon and SEG continued to engage in discussions and negotiations related to a potential business transaction by email, telephone, and Skype. Based on these allegations, SEG has made a *prima facie* showing that Photon has "transacted business" in Delaware by virtue of its deliberate solicitation of a company actually based, and not just incorporated, in Delaware, its physical presence in Delaware (albeit only briefly) in furtherance of those solicitations, and the numerous communications, electronic and otherwise, it directed towards Delaware to facilitate a potential transaction with that Delaware-based entity.

The conclusion that SEG has made a *prima facie* showing that Photon transacted business in Delaware is supported further by the Burcat Affidavit submitted with SEG's opposition to Defendants' motion to dismiss. According to Burcat's sworn statement: (1) Photon and SEG discussed specifically the possibility of partnering to develop at least one project located in Delaware; (2) while meeting in Wilmington, Photon and SEG also discussed the possibility of Photon acquiring SEG so that it could establish a permanent presence in the United States; and (3) the parties began negotiating the terms of the NDA

16

while they met in Delaware.[21] Considered together with the Complaint, the Burcat Affidavit makes a strong showing that Photon's conduct in this case constitutes the transaction of business in Delaware within the meaning of Delaware's Long Arm Statute.

**b.      SEG's causes of action arise from Photon's transaction of business in Delaware**

In addition to alleging that a defendant transacted business in Delaware, a plaintiff asserting that jurisdiction exists under the Long Arm Statute also must allege that there is a "nexus" between that transaction of business and its cause of action.[22] "The 'arising from' language in 10 *Del. C.* § 3104(c)(1) requires that the defendant's act set 'in motion

---

[21]   Burcat Aff. ¶¶ 2, 7. Defendants dispute SEG's claim as to when negotiations over the NDA began. In a November 28, 2012 email from Lambert to Burcat and D'Amours, Lambert requested that SEG "please also provide an NDA if you have a standard one." Defs.' Opening Br. Ex. C at 3. According to Defendants, it is unlikely that Lambert would have requested that SEG send a "standard" NDA, if, as SEG claims, the parties had been negotiating the terms of an NDA for months. Notably, the final NDA was signed by PEP, not Photon. One reasonable inference that could be drawn at this early stage of the proceedings is that after Photon and SEG began negotiating the terms of the NDA, it was decided that it would be more appropriate to make PEP, rather than Photon, a party and that, after that point, Lambert decided on PEP's behalf that using SEG's standard form was the best way to proceed. Therefore, while I cannot resolve this disputed fact issue at this juncture, I note that SEG's assertion that it began negotiating the terms of the NDA with Photon while meeting with Photon in Delaware is sufficiently colorable that I can assume its truth for purposes of deciding Defendants' motion to dismiss.

[22]   *Mobile Diagnostic Gp. Hldgs., LLC v. Suer*, 972 A.2d 799, 804 (Del. Ch. 2009). *See also* 10 *Del. C.* § 3104(c) (stating the statute applies only to "a cause of action brought by any person *arising from* any of the acts enumerated in this section") (emphasis added).

17

a series of events which form the basis for the cause of action before the court.'"[23] This Court also has interpreted the "arise from" language such that it encompasses a party's "acts within the jurisdiction that were 'critical steps in the chain of events' resulting in the cause of action before the court."[24]

As to SEG's claims that Photon breached the terms of the NDA and misappropriated its Proprietary Information, the allegations in the Complaint and the Burcat Affidavit suffice to make a *prima facie* showing that those claims "arise from" Photon's transaction of business in Delaware. Photon solicited the Delaware-based SEG, met with SEG in Delaware, and allegedly directed hundreds of communications, electronic and otherwise, to SEG in Delaware for the apparent purpose of trying to find at least one solar development project on which the two sides could partner. The Burcat Affidavit suggests that the parties understood as of the time they held an in-person meeting in Delaware that it would be necessary to exchange some confidential information, and that they began immediately to take steps to facilitate such an exchange. After the in-person meeting, Photon continued to direct communications into Delaware for the purpose of coming to an agreement with SEG that would enable Photon to have access to SEG's confidential information. Finally, the gravamen of the Complaint is that

---

[23]     *Sprint Nextel Corp. v. iPCS, Inc.,* 2008 WL 2737409, at *9 (Del. Ch. July 14, 2008) (quoting *Haisfield v. Cruver,* 1994 WL 497868, at *4 (Del. Ch. Aug. 25, 1994)).

[24]     *Id.* at *9 n.64 (quoting *Sears, Roebuck & Co. v. Sears plc,* 752 F. Supp. 1223, 1227 (D. Del. 1990)).

the real reason Photon reached out to SEG in the first place was to gain access to SEG's project pipeline and other confidential information, not to actually reach a partnership arrangement with it. Photon's actions in, as well as those directed toward, Delaware, therefore, were "critical steps in the chain of events resulting in the cause of action before the court." Thus, SEG has made a *prima facie* showing that its claims against Photon "arise from" its transaction of business in Delaware.

In resisting that conclusion, Defendants argue that SEG's causes of action cannot "arise from" their transaction of business in Delaware because SEG's claims relate to events that occurred after the signing of the NDA, and any "transaction of business" in Delaware by Defendants occurred before the NDA was executed. Based on the allegations in the Complaint, however, I find Defendants' argument to be hypertechnical and unpersuasive.

On the limited record before me, Defendants' conduct in Delaware and directed toward Delaware appears to be bound inextricably to SEG's claims. Contrary to Defendants' assertions otherwise, it does not appear that, at this juncture, this Court could delineate definitively which of Plaintiff's claims, if any, solely arise from Defendants' actions in Delaware before the execution of the NDA. Moreover, if Defendants' understanding of Delaware law were correct, a non-Delaware party could come into the State to negotiate the terms of an agreement with a Delaware resident, and yet the Delaware resident would not be able to pursue a breach of contract claim against that party in a Delaware court if the non-Delaware party executed the agreement outside of Delaware and the breach also occurred outside of Delaware. Not surprisingly,

19

Defendants cited no authority suggesting that their assertion represents an accurate statement of Delaware law.[25]

While a more developed evidentiary record may reveal that Plaintiff's claims do not arise from Defendants' transaction of business in Delaware, SEG has made a *prima facie* showing that the opposite is true. Therefore, I conclude that SEG has made the requisite showing as to Photon's amenability to personal jurisdiction under Delaware's Long Arm Statute.

### c.      The Court's exercise of personal jurisdiction over Photon comports with due process

Having determined that SEG's allegations against Photon satisfy Section 3104(c)(1) of the Long Arm Statute, I also must address whether subjecting Photon to jurisdiction in Delaware would be consistent with the Due Process Clause of the Fourteenth Amendment. Personal jurisdiction over a nonresident is consistent with due

---

[25] Moreover, adopting Defendants' argument likely would increase significantly the number of instances in which Delaware residents would be forced to file suit in foreign jurisdictions to vindicate their rights. As a practical matter, this would make it more difficult, if not impossible, for Delaware residents to seek redress for harms done to them by foreign parties who make a conscious decision to come to Delaware and seek them out. Delaware public policy underpinning the Long Arm Statute mandates that it be interpreted as broadly as due process will allow, thereby affording Delaware residents with the greatest protections possible. *See Hercules Inc. v. Leu Trust & Banking (Bahamas) Ltd.*, 611 A.2d 476, 480 (Del. 1992) ("First, we must consider whether Delaware's long arm statute is applicable, recognizing that 10 *Del. C.* § 3104(c) is to be broadly construed to confer jurisdiction to the maximum extent possible under the Due Process Clause."). Because Defendants' position would lead to results directly inimical to that long-standing and settled policy, I find it to be without merit.

20

process when it comports with traditional notions of fair play and substantial justice.[26] To meet this standard, the "defendant's conduct and connection with the forum state should be such that he can reasonably anticipate being haled into court in the nonresident forum."[27] "A basic tenet of the due process analysis of a court's exercise of personal jurisdiction is whether the party 'purposefully availed' itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws."[28]

In this case, Photon solicited a Delaware-based business, sent representatives to attend an in-person meeting in Delaware, and directed scores, if not hundreds, of electronic and telephonic communications into Delaware. Based on these facts, I conclude that SEG has made a *prima facie* showing that Photon purposefully availed itself of the privilege of conducting business within Delaware. In addition, because of its extensive contacts and negotiations with a company located in Delaware, Photon reasonably could have anticipated being haled into court in Delaware as a result of a dispute arising from those same contacts and negotiations. SEG, therefore, has carried its burden of making a *prima facie* showing that the exercise of personal jurisdiction over Photon is consistent with the Due Process Clause of the Fourteenth Amendment.

---

[26]     *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 477–78 (1985).

[27]     *Werner v. Miller Tech. Mgmt., L.P.,* 831 A.2d 318, 330 (Del. Ch. 2003).

[28]     *Id.* at 330 n.46.

21

**4.      PEP and PEI are subject to personal jurisdiction under 10 *Del. C.* § 3104(c)**

According to the Complaint, PEP and PEI are wholly owned subsidiaries of Photon. Although they are separate legal entities from Photon, at this early stage of the proceedings, SEG has made a *prima facie* showing that there is sufficient overlap of personnel between Photon, PEP, and PEI such that Photon's actions can be attributed to both PEP and PEI because those who acted on Photon's behalf also were doing so as employees of PEP or PEI .[29]

The NDA at issue in this case actually was executed between SEG and PEP. Because at this stage of the litigation it appears that the NDA was the byproduct of the in-person meeting in Delaware between Photon and SEG, one reasonable inference that can be drawn from the Complaint is that SEG interacted and negotiated with at least some key individuals who simultaneously were representing both Photon and PEP. This inference is supported further by the allegations in the Complaint that SEG and PEP executed the NDA for the purpose of evaluating the feasibility of partnering together on a project, including the two projects in New Jersey that form the basis of SEG's tortious interference claim. SEG alleges that, both before and after the NDA was signed, it was working with Photon representatives, including Novotny and Fry, to put a bid together for the New Jersey projects. Because one intended purpose of the NDA was to facilitate

---

[29]    The possibility remains, however, that a more fully developed evidentiary record will show that Photon, PEP, and PEI are sufficiently distinct and their actions sufficiently differentiable that the exercise of personal jurisdiction over PEP and PEI ultimately would not be appropriate under the Long Arm Statute.

such interactions, the Complaint supports a reasonable inference that those responsible for negotiating the NDA from Defendants' side of the transaction did so as representatives of both Photon and PEP.

As to PEI, the Complaint alleges that: (1) Photon announced that PEI would be the issuer of the bonds; (2) Photon prepared the Bond Investor Presentation that PEI disseminated in connection with the sale of the bonds; and (3) SEG spoke with Photon employees Peter Deege and Novotny when attempting to resolve the issue of the alleged misuse of its proprietary and confidential information in connection with the bond offering.  In addition, Jan Krcmar, Photon's Communications Director, submitted an affidavit claiming that he is "responsible for the management and dissemination to Photon's stockholders and, when appropriate, to the public, of information about Photon and its operations."[30]  Significantly, Krcman defined "Photon" in his affidavit as Photon, PEP, and PEI, collectively.[31]  Thus, Defendants themselves appear to acknowledge that at least some of their employees have roles across multiple Photon entities and represent those entities simultaneously, and that it is not always clear on which entity's behalf those employees were acting in their interactions with SEG and others.

---

[30]    Defs.' Opening Br. Ex. F ¶ 2.

[31]    *Id.* ¶ 1.  Novotny also submitted an affidavit in which he stated, among other things, that "[f]ollowing the in-person visit to Philadelphia, New Jersey, and Delaware, I and others from Photon communicated with SEG."  Defs.' Opening Br. Ex. B ¶ 5.  Novotny defined "Photon" in his affidavit to mean Photon Energy N.V. together with its subsidiaries, including PEP and PEI.  *Id.* ¶ 1.

23

In sum, based on the preliminary and limited record before me, I conclude that SEG has made a *prima facie* showing that there is sufficient overlap between Photon, PEP, and PEI such that those who solicited SEG, met with SEG representatives in Delaware, directed numerous communications into Delaware, executed a confidentiality agreement, and allegedly misused SEG's confidential information, did so directly on behalf of some combination of Photon, PEP, and PEI. I already have concluded that Photon is subject to personal jurisdiction in Delaware under the Long Arm Statute. Because many, if not all, of Photon's actions also can be attributed to PEP and PEI at this early stage in the litigation by virtue of the apparent overlap of key employees who represented simultaneously the various Photon entities in their interactions with SEG, SEG also has made a *prima facie* showing that PEP and PEI are subject to personal jurisdiction in Delaware under the Long Arm Statute.[32]

### B.      Service of Process

Defendants next argue that the Complaint should be dismissed pursuant to Rule 12(b)(5) for insufficiency of service of process. According to SEG, Defendants were served properly pursuant to Article 10(a) of the Hague Convention. Article 10 states:

> Provided the State of destination does not object, the present Convention shall not interfere with –
>
> a)      the freedom to send judicial documents, by postal channels, directly to persons abroad,

---

[32]    The reasons that exercising personal jurisdiction over Photon comports with due process apply with equal force to the exercise of personal jurisdiction over PEP and PEI.

24

b) the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials of other competent persons of the State of destination,

c) the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination.[33]

After initiating this litigation, SEG served the Complaint on Defendants by sending it to their place of business via Federal Express. After Defendants questioned whether Federal Express constituted a "postal channel" within the meaning of Article 10, SEG sent an additional copy of the Complaint to Defendants via international mail. Defendants do not argue that The Netherlands, the "State of destination" in this case, has objected to any provision in Article 10, nor do they argue that they failed to receive either of SEG's mailings containing a copy of the Complaint. Rather, Defendants assert that Article 10(a) does not authorize the service of *initial* process through "postal channels."

The basis for Defendants' argument stems from the differences in word choice utilized in the various subsections of Article 10. While Article 10(a) permits parties to "send" judicial documents, both subsections (b) and (c) refer explicitly to "effect[ing] service" of judicial documents. Defendants aver that had the Hague Convention's drafters intended to allow service of process through Article 10(a), they would have used the word "service," as they did in Articles 10(b) and (c), instead of "send." According to

---

[33] Hague Convention Art. 10.

Defendants, therefore, service of process cannot be effectuated through Article 10(a), and Defendants were never served properly in this litigation because SEG admits that it only served Defendants in accordance with Article 10(a).

It does not appear that courts in the United States apply Article 10(a) uniformly. Moreover, there is no Delaware Supreme Court case that addresses this issue. Nevertheless, I conclude that the weight of the relevant authorities supports the conclusion that Delaware would interpret Article 10(a) as providing an acceptable means of providing service of process. "Delaware case law holds that where the requirements for service of process under the Delaware long arm statute are satisfied, then so, too, are the service requirements under the [Hague] Convention."[34] The Long Arm Statute allows for service to be made "[b]y any form of mail addressed to the person to be served and requiring a signed receipt."[35] Defendants do not contest seriously that SEG's mailings through Federal Express and international mail comply with the Long Arm Statute's service of process requirements. Consequently, SEG's actions in this case also satisfy the requirements of the Hague Convention.

---

[34] *Stonington P'rs, Inc. v. Lernout & Hauspie Speech Prods., N.V.*, 2003 WL 21555325, at *3 (Del. Ch. July 8, 2003). Conceivably such a holding would be inapplicable, or at least modified, in situations where a foreign country "objects" to the utilization of some or all of the mechanisms prescribed in Section 10. I need not address that potential issue, however, because The Netherlands has not objected to any part of Article 10.

[35] 10 *Del. C.* § 3104(d)(3).

An additional and independent ground for finding that Defendants were served properly in this litigation is that other Delaware courts have rejected their unduly narrow interpretation of Article 10, either explicitly or in persuasive *dicta.* For example, in *Quinn v. Keinicke*,[36] the Delaware Superior Court offered a well-reasoned and comprehensive analysis of why it would interpret Article 10(a) as being an acceptable means of service of process if that issue actually was before it.[37] The court in *Quinn* noted that the purpose of the Hague Convention was to "lay a basic framework to which all countries could agree and upon which a litigant could always fall back, while not preventing ratifying countries from permitting, or litigants from using, less complex and less bureaucratic methods [of service]."[38] This, combined with the fact that the "Preamble [to the Hague Convention] makes reference to 'simplifying' and 'expediting,' not complicating and hindering," led the *Quinn* court to conclude, in *dicta*, that "[a]llowing service by mail under Article 10(a) comports with the liberal approach intended by the signatory nations."[39]

---

[36]   700 A.2d 147 (Del. Super. 1996).

[37]   *Id.* at 156–60.

[38]   *Id.* at 160.

[39]   *Id.*

*Quinn*'s discussion of Article 10(a) has been followed expressly by the Superior Court[40] and also has been cited approvingly by this Court.[41] In addition, a leading treatise on Delaware law has noted that Delaware courts have interpreted Article 10(a) as an acceptable means of effectuating adequately service of process,[42] and that such a position appears to be most consistent with the intent of those that oversee the Hague Convention.[43] In the context of this case, I find the logic underpinning *Quinn, Wright,* and *Stonington Partners* to be persuasive, particularly in light of the absence of any

---

[40] *See Wright v. Am. Home Prods. Corp.*, 768 A.2d 518, 526 (Del. Super. 2000) ("This Court, under these circumstances, will further hold that plaintiffs' sending, by registered mail to each defendant, constitutes service under Article 10(a) of the Hague Service Convention. In reaching this holding, the Court accepts the *dicta* of the *Quinn* court. It found more persuasive the line of cases that service was effectuated by mail.").

[41] *See Stonington P'rs, Inc. v. Lernout & Hauspie Speech Prods., N.V.*, 2003 WL 21555325, at *3 (Del. Ch. July 8, 2003) ("Delaware Courts have interpreted Article 10(a) of the Convention broadly to effect its intended purpose, which is to simplify service of process upon nonresident defendants abroad.") (citing *Quinn,* 700 A.2d at 159).

[42] *See* Donald J. Wolfe, Jr. & Michael A. Pittinger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 3.04[e][3], at 3-117 (2013) ("The state of Delaware has sided with jurisdictions holding that service by mail is proper under the [Hague] Convention.")

[43] *See id.* at 3-118–19 ("The Special Commission on the Practical Operation of the Hague Apostille, Evidence and Service Conventions ('Special Commission') seems to agree with the Delaware courts' interpretation of Article 10(a). In the Fall of 2003, the Special Commission met to review the practical operation of the Hague Conventions. In its conclusions, the Special Commission 'reaffirmed its clear understanding that the term 'send' in Article 10(a) is to be understood as meaning 'service' through postal channels.'") (citations omitted).

28

significant Delaware case law to the contrary. Therefore, I conclude that Defendants received adequate service of process under the Hague Convention.

Having decided that this Court may exercise personal jurisdiction over Defendants and that Defendants were served properly, I turn next to Defendants' substantive arguments that none of the counts of SEG's Complaint state a claim upon which relief can be granted.

### C. Failure to State a Claim Upon Which Relief Can be Granted

Because the Court may exercise personal jurisdiction over Defendants and because Defendants were effectively served, I must determine whether SEG has pled adequately its claims for breach of contract, misappropriation of confidential information, and tortious interference with a prospective business opportunity. I examine SEG's asserted causes of action in turn.

### 1. Legal standard

Pursuant to Rule 12(b)(6), this Court may grant a motion to dismiss for failure to state a claim if a complaint does not assert sufficient facts that, if proven, would entitle the plaintiff to relief. As recently reaffirmed by the Delaware Supreme Court,[44] "the governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[45] That is, when considering such a motion, a court must:

---

[44] *See Winshall v. Viacom Int'l, Inc.*, 2013 WL 5526290, at \*4 n.12 (Del. Oct. 7, 2013).

[45] *Central Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011) (footnote omitted).

accept all well-pleaded factual allegations in the Complaint as true, accept even vague allegations in the Complaint as "well-pleaded" if they provide the defendant notice of the claim, draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not recover under any reasonably conceivable set of circumstances susceptible of proof.[46]

This reasonable "conceivability" standard asks whether there is a "possibility" of recovery.[47] If the well-pled factual allegations of the complaint would entitle the plaintiff to relief under a reasonably conceivable set of circumstances, the court must deny the motion to dismiss.[48] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[49] Moreover, failure to plead an element of a claim precludes entitlement to relief and, therefore, is grounds to dismiss that claim.[50]

## 2. Breach of the NDA

### a. Legal standard

To establish a breach of contract claim, a party must prove: (1) the existence of a contract; (2) the breach of an obligation imposed by the contract; and (3) damages that

---

[46] *Id.* (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[47] *Id.* at 537 & n.13.

[48] *Id.* at 536.

[49] *Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[50] *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963, 972 (Del. Ch. 2000) (Steele, V.C., by designation).

30

the plaintiff suffered as a result of the breach.[51] In this action, the existence of a valid contract between SEG and PEP is uncontested.[52] Thus, to determine whether SEG has stated claims for breach of contract, I focus on whether SEG adequately has pled the elements of breach and damages as to the provisions of the NDA that it alleges have been violated.

### b. It is reasonably conceivable that Defendants breached the NDA

In Counts I and II of the Complaint, SEG alleges that PEP and Photon and PEI, respectively, breached the provisions of the NDA requiring Defendants to hold SEG's Proprietary Information in confidence. This includes the sharing of SEG's Proprietary Information with "unauthorized third parties, while failing to take necessary steps to protect against further disclosure and use" and using SEG's Proprietary Information "not for the purpose of evaluating a potential transaction with SEG or determining how to operate pursuant to such a transaction, but for [Defendants'] own purposes in attempting to woo prospective investors."[53]

---

[51] *Osram Sylvania Inc. v. Townsend Ventures, LLC*, 2013 WL 6199554, at *6 (Del. Ch. Nov. 19, 2013).

[52] Although PEP is the only Defendant that is a "party" to the NDA, SEG alleges that Photon and PEI are "affiliates" or "Representatives" of PEP, meaning that they too are bound by the NDA pursuant to Section 2(a) of that document. Defendants have not challenged this allegation, and, thus, for purposes of this motion to dismiss, I assume that the NDA is enforceable against Photon and PEI.

[53] Compl. ¶ 61.

Much of the parties' briefing on this issue focused on the disclosures made in the Bond Investor Presentation and an amended version of that presentation. In the original version of that document, PEI listed "Woolwich PV 300" in New Jersey as one of its pipeline projects.[54] In the amended version of the presentation, the Woolwich reference was removed.[55] Defendants argue that the disclosure of the location of the project and certain information about the project's electrical capacity cannot, as a matter of law, constitute Proprietary Information because there were no other disclosures that revealed any connection between SEG and the project.

At this early stage of the proceedings, it is unclear how much information the phrase "Woolwich PV 300" actually revealed to the public.[56] It also is unclear what, if anything, about the Woolwich project was known publicly. But even if the phrase "Woolwich PV 300" is not Proprietary Information, SEG's claims extend beyond that one disclosure. SEG alleges in the Complaint that in addition to the Bond Investor

---

[54]    Defs.' Opening Br. Ex. H at 18.

[55]    Defs.' Opening Br. Ex. I at 18.

[56]    In the Complaint, SEG alleges: (1) in a conversation on February 24, 2013, "Photon's representatives confirmed that the use of SEG's pipeline project information in bond solicitation materials was not authorized"; (2) Defendants removed SEG's pipeline information from various bond solicitation documents; and (3) during a March 12, 2013 Skype call, "Deege [from Photon] stated that including SEG's U.S. projects in the pipeline of Photon's projects in the prospectus for the sale of PEI's bonds was 'stupid.'" Compl. ¶¶ 42-44. These allegations support a reasonable inference that Defendants understood that the information they were disclosing was confidential or proprietary in nature and could qualify as Proprietary Information under the NDA.

32

Presentation, "credit analyst reports concerning the sale" of Defendants' bonds also contained SEG's Proprietary Information.[57] The exact nature of the information in these credit reports is neither discussed in the Complaint nor referenced in any of the parties' briefing. It is reasonably conceivable that the credit reports contain information that could be considered more definitively Proprietary Information than that contained in the Bond Investor Presentation. The record for purposes of Defendants' motion to dismiss does not indicate that Defendants have made any effort to have the credit analyst reports amended or modified. Thus, it is reasonably conceivable that Proprietary Information regarding the Woolwich Township project or other Proprietary Information appeared in those reports as a result of Defendants' disclosures and remains publicly available in violation of the NDA.

Moreover, even assuming that Defendants are correct in their assertion that, as a matter of law, none of the information they disclosed publicly was Proprietary Information, it nevertheless is reasonably conceivable that SEG can prove on a full evidentiary record that one or more Defendants breached the NDA. Section 2(a)(ii) of the NDA requires that Proprietary Information be used "solely for the purpose of evaluating whether to enter into the Transaction and, if such Transaction is consummated, how best to effect such Transaction."[58] One reasonable interpretation of this language is that Defendants were prohibited from using SEG's Proprietary Information in another

---

[57]    Compl. ¶ 61.

[58]    Defs.' Opening Br. Ex. E at 2.

33

form for their own benefit. In this litigation, SEG has alleged sufficiently that Defendants' purpose in executing the NDA was to obtain information from SEG that it could use to make their bonds more appealing to investors. SEG also has alleged that Defendants learned about certain solar projects in the United States as a result of SEG sharing its Proprietary Information, such as expansion plans, with Defendants. Based on the language of the NDA, it is reasonably conceivable that Defendants breached that agreement by using SEG's Proprietary Information as a source for the data in the Bond Investor Presentation, and its subsequent amendment. That is, even if the information disclosed in the presentations did not constitute Proprietary Information, it is reasonably conceivable that SEG could prove that Defendants used the data and other Proprietary Information SEG made available to them to develop the language in the Bond Investor Presentation. Because such a use would not be "solely for the purpose of evaluating whether to enter into the Transaction," SEG has alleged sufficiently that Defendants breached the NDA regardless of whether the information disclosed in the Bond Investor Presentation and elsewhere is itself Proprietary Information.

c.      **SEG has alleged adequately that it has incurred damages as a result of Defendants' alleged breach of the NDA**

Section 7(b) of the NDA states that the unauthorized disclosure of Proprietary Information is "likely to result in irreparable injury" to the non-breaching party and that because a "remedy at law alone will be an inadequate remedy for such breach" the non-

34

breaching party "shall be entitled to seek the specific performance of" the NDA.[59] SEG also has alleged specifically that it has been irreparably harmed by Defendants' disclosure of its Proprietary Information.[60] Because the Complaint supports a reasonable inference that there are publicly available documents containing SEG's Proprietary Information as a result of Defendants' disclosures of that information or that Defendants have misused its Proprietary Information and because it is reasonably conceivable that Defendants presently remain in possession of certain of SEG's Proprietary Information, it follows that SEG's request for injunctive relief has not been mooted and that it is reasonably conceivable that it will be entitled to at least the equitable relief it is seeking in this litigation. In that regard, I note also that, based on the allegations in the Complaint, monetary damages for Defendants' alleged breach of the NDA remains a viable remedy. Because SEG alleges it made highly sensitive information available to Defendants, depending on the nature of the Proprietary Information that SEG can prove was used or disclosed improperly, it is conceivable that SEG can prove that those uses or disclosures harmed its business in a manner that would entitle it to monetary relief. Therefore, SEG has pled sufficiently all of the necessary elements of its breach of contract claim. Accordingly, I will deny Defendants' motion to dismiss Counts I and II of the Complaint.

---

[59]    *Id.* at 4.

[60]    Compl. ¶¶ 53-56.

### 3. Misappropriation of confidential information

#### a. Legal standard

A plaintiff asserting a claim for misappropriation or conversion of confidential information must plead: (1) that it had a property interest in the confidential information; (2) that the defendant wrongfully exerted dominion over the confidential information; and (3) that the plaintiff sustained damages as a result.[61]

#### b. SEG has pled adequately its claim for misappropriation of confidential information

At the outset, I note that the parties to this litigation devoted little argument to SEG's claim for misappropriation. Between the three briefs that were filed related to Defendants' motion, SEG and Defendants devoted less than two-and-a-half pages, in total, to this claim. The parties' cursory treatment of Counts III and IV with arguments that almost exclusively replicated those made with respect to Counts I and II indicate that they viewed the misappropriation claim as essentially an alternative argument to SEG's breach of contract claim. I concur that Counts III and IV most logically represent alternative causes of action to Counts I and II, and, as such, my analysis of SEG's claim for breach of the NDA applies equally to SEG's misappropriation claim. Counts III and IV would apply if, for example, the NDA were held unenforceable against one or more defendants.

---

[61] *Overdrive, Inc. v. Baker & Taylor, Inc.*, 2011 WL 2448209, at *5 (Del. Ch. June 17, 2011).

One element of SEG's misappropriation cause of action that was not encompassed in my analysis of the breach of the NDA claim, however, is whether SEG has alleged adequately that it had a property right in the confidential information that Defendants purportedly misappropriated. As to that element, SEG and Defendants agreed contractually to a broad definition of Proprietary Information in the NDA. Thus, each side recognized that the other possessed a wide range of information that could be considered confidential and which it had a right to protect. Based on these facts, it is reasonably conceivable that SEG will be able to prove that it had a property interest in the confidential information it shared with Defendants, and which Defendants are alleged to have used and disclosed impermissibly. For example, at this juncture, it is a disputed issue of fact as to whether, and to what extent, information about the Burlington and Woolwich Township projects were known publicly. The Complaint supports a reasonable inference that SEG learned about these projects through the expenditure of resources and development of industry connections. Thus, if information about the projects was not generally known to the public, it is reasonably conceivable that SEG can prove that such information was confidential information in which it had a property interest,[62] thereby satisfying the first element of its misappropriation claim.

---

[62] In many respects, the location of, and information about, the Burlington and Woolwich Township projects, for example, appear to be analogous to a company customer list. In certain instances, this Court has found customer lists to constitute protectable confidential information. *See, e.g., Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at *19 (Del. Ch. Jan. 29, 2010).

As discussed in my analysis of SEG's breach of contract claim, it also is reasonably conceivable that Defendants wrongfully exerted dominion over SEG's confidential information. SEG had pled sufficiently that Defendants have used or disclosed its Proprietary Information in breach of the NDA. SEG provided Defendants with its Proprietary Information subject to the conditions set forth in the NDA, and use of SEG's information in violation of those conditions would be inconsistent with SEG's rights to control its property. Thus, because it is reasonably conceivable that Defendants used or disclosed impermissibly SEG's confidential information, it also is reasonably conceivable that Defendants wrongfully exerted dominion over SEG's confidential Proprietary Information.

Finally, as to the element of damages, SEG alleges that it has been harmed irreparably by Defendants' misappropriation of its confidential information and seeks an order from this Court requiring Defendants to return any and all SEG Proprietary Information they currently possess. Defendants have failed to offer any persuasive argument as to why it is not reasonably conceivable that the injunctive relief SEG is seeking or some form of monetary damages would be unavailable should it prevail on the merits of its misappropriation claim. Therefore, I conclude that SEG has pled adequately each element of its misappropriation of confidential information claim, and, as such, I deny Defendants' motion to dismiss Counts III and IV of the Complaint.

### 4. Tortious interference

Finally, I address SEG's claim that Photon tortiously interfered with its prospective business opportunities with the Burlington and Woolwich Township projects.

38

### a. Legal standard

SEG's tortious interference claim is predicated on an expectancy, rather than the existence, of a contractual relationship with Burlington and Woolwich Township. Under Delaware law, an action for tortious interference with prospective contractual relations requires: (1) a reasonable probability of a business opportunity or prospective contractual relationship; (2) intentional interference by a defendant with that opportunity; (3) proximate cause; and (4) damages.[63] Furthermore, all of these requirements must be considered in light of a defendant's privilege to compete or protect his business interests in a lawful manner.[64] Because I find that SEG has not pled sufficiently that it had a reasonable expectancy of being awarded either the Burlington or Woolwich Township projects, I dismiss SEG's tortious interference claim with prejudice.[65]

### b. The Burlington project

### 1. SEG has not alleged adequately a reasonable expectancy of being awarded the Burlington project

The Complaint lacks sufficient allegations from which the Court can draw a reasonable inference that SEG had a reasonable expectancy in the Burlington project.

---

[63]   *DeBonaventura v. Nationwide Mut. Ins. Co.,* 428 A.2d 1151, 1153 (Del. 1981).

[64]   *Id.*

[65]   It also is highly questionable as to whether SEG has alleged adequately the intentional interference element of its tortious interference claim. It is unclear whether Defendants' purported misleading of SEG as to whether it wished to partner with SEG on solar projects would be sufficient to establish intentional interference. I need not address that issue, however, because I conclude that SEG's tortious interference claim fails for the independent reason that it lacked a reasonable expectancy in either of the projects at issue in this litigation.

There are no allegations in the Complaint that describe SEG's relationship with the Burlington project decisionmakers or the competitive landscape for the Burlington project. That landscape would include, for example, the number of firms being considered for the project and the reasons that SEG was at least as qualified as those other firms and at least equally likely to be awarded the project.

In addition, SEG did not allege it was capable of procuring either the Burlington or Woolwich Township project itself, and it appears from the Complaint that SEG's ability to secure either or both of those projects was contingent on SEG having a business partner, either in the nature of a solar developer or a funding source or both. SEG and Defendants never reached an agreement to partner on the Burlington project, nor were Defendants under any obligation to reach such an agreement with SEG. Moreover, SEG has not alleged that it had a relationship with any other solar developers or financing sources with whom they could have partnered to submit a conforming bid or proposal for the Burlington project. SEG offers no persuasive explanation and cites no authority to support its claim that it had a reasonable expectation of being awarded the Burlington project when it could not satisfy certain of the project's most basic criteria such as a partnership with a solar developer and proof of adequate financing.

SEG evidently expected that, together with one or more of Defendants, it could have had a reasonable expectancy of obtaining the Burlington project. There is no allegation, however, that SEG and any Defendant ever actually agreed jointly to pursue the Burlington project or that any Defendant owed SEG an obligation to do so. There

also is no basis upon which the Court reasonably could infer that SEG could have obtained the Burlington job on its own.

Finally, SEG's argument that Defendants' alleged inclusion of the Burlington project in its bond marketing materials evidences SEG's reasonable expectancy in securing that project is unpersuasive. As discussed *supra*, the alleged reference to the Burlington project occurs in solicitation materials about Photon. It is one of numerous listed "pipeline projects," but that list bears an explicit legend that it is "subject to change."[66] The reference makes no mention of SEG at all. Because the standard is whether SEG had a reasonable expectancy of securing the project, I am not convinced that Photon's apparent belief about the Burlington project, which was presented in a report that was designed to facilitate the sale of Photon's bonds, allows me to overcome the aforementioned deficiencies in SEG's Complaint and draw a reasonable inference that SEG had a reasonable expectancy of being awarded the Burlington project. For this reason, SEG's tortious interference claim with respect to the Burlington project is not viable.

### c. The Woolwich Township project

**1. SEG has not alleged adequately a reasonable expectancy of being awarded the Woolwich Township project**

Although the allegations in the Complaint arguably come closer to being sufficient in terms of whether SEG had a reasonable expectancy in the Woolwich Township

---

[66] Defs.' Opening Br. Ex. I at 18-19.

project, they still are inadequate to survive a motion to dismiss. In addition to alleging that SEG was one of only two potential bidders for the Woolwich Township project, the Complaint also states that SEG: (1) previously had completed a solar project for Woolwich Township; (2) relied on the township to provide business references attesting to the quality of its work; and (3) had been told by members of Woolwich's Town Council that they wanted SEG to work on the project. Like the Burlington project, however, there are no allegations that SEG was capable of securing the Woolwich Township project on its own. Rather, SEG needed to partner with a solar developer able to provide any necessary financial assurances, such as Photon.[67] Also like the Burlington project, SEG has not alleged that any Defendants were obligated to partner with it on the Woolwich Township project or that it had other potential partners it could have used if Defendants had been honest about their intentions from the start of their relationship. Because SEG could not have satisfied the Woolwich Township project requirement on its own and had no right to compel Photon to partner with it on that project, SEG has failed to demonstrate that it conceivably had a reasonable expectation of procuring the Woolwich Township project. Thus, SEG's tortious interference claim regarding the Woolwich Township project must be dismissed with prejudice.

---

[67] *See* Compl. ¶ 32 ("As Woolwich Township would rely upon the cost savings numbers for contractual purposes *and would sign a power purchase agreement with Photon*, Photon was the party that needed to provide the financial assurances and obligations.") (emphasis added).

### III. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is granted with respect to Count V of the Complaint. In all other respects, Defendants' motion to dismiss is denied.

**IT IS SO ORDERED**.